CENTRAL CORPORATION, Plaintiff-Appellant-
Petitioner,

v.

RESEARCH PRODUCTS CORPORATION, Defendant-
Respondent.

Supreme Court

*No. 02–1974. Oral argument April 1, 2004.—Decided
June 15, 2004.*

2004 WI 76

(Also reported in 681 N.W.2d 178.)

WILCOX and SYKES, J.J., took no part.

For the plaintiff-appellant-petitioner there were briefs by *Daniel W. Hildebrand* and *DeWitt Ross & Stevens, S.C.,* Madison, and *John M. Kelly* and *Dempsey, Williamson, Young, Kelly & Hertel, L.L.P.,* Oshkosh, and oral argument by *Daniel W. Hildebrand.*

For the defendant-respondent there was a brief by *Michael J. Lawton, Kenneth B. Axe* and *Lathrop & Clark, LLP,* Madison, and oral argument by *Kenneth B. Axe.*

¶ 1. N. PATRICK CROOKS, J. Petitioner Central

Corporation (Central) seeks review of the court of appeals' decision, *Central Corp. v. Research Products Corp.*, No. 02–1974, unpublished slip op. (Wis. Ct. App. July 28, 2003), affirming the circuit court's decision to grant summary judgment in favor of Research Products Corporation (Research) and dismiss Central's complaint alleging a violation under the Wisconsin Fair Dealership Law (WFDL). The circuit court granted Research's motion for summary judgment, stating that Central was not a dealer of Research's products under the WFDL. Central appealed, and the court of appeals affirmed.

¶ 2. We conclude that summary judgment was improperly granted to Research. Genuine issues of material fact exist here, as well as reasonable alternative inferences drawn from undisputed material facts, so that a trial is warranted in this case to determine whether there is a community of interest, and, therefore, a dealership relationship. Several facets of Central's relationship with Research lead to the conclusion that, under the WFDL, summary judgment should not have been granted. Those factors, and the alternative inferences that may be drawn from them, include: the parties' 20–year business relationship; Central's owners' significant financial investment in the construction of a warehouse based, in part, on the amount of Research's products it housed; Central's practice of keeping a substantial amount of Research's product in inventory; Research's desire to limit Central's sales to a specific territory; and Central's practice of keeping spare parts for Research's products on hand for sale, at cost, to its customers. Where there are genuine issues of material fact or reasonable alternative inferences drawn from undisputed material facts, the determination of whether there is a community of interest is one

which will be made by the trier of fact based on an examination of all of the facets of the business relationship.

I

¶ 3. On June 27, 2001, Research wrote a letter to Central stating that it would stop selling its products to Central effective in 60 days. Central filed the complaint in this case at the end of that 60–day period. In its complaint, Central stated that there was a community of interest, as contemplated in Wis. Stat. § 135.02(3)(a) (2001–02),[1] between itself and Research "because there is a continuing financial interest between the parties in the sale and distribution of these goods and the parties are dependent upon each other for the sales and distribution of the goods." Central alleged that Research's decision to terminate the parties' relationship violated Wis. Stat. § 135.03[2] since there was no good cause to terminate the dealership arrangement. Moreover, Central alleged that Research failed to provide Central with

---

[1] Unless otherwise indicated, all references to Wisconsin Statutes are to the 2001–02 edition. Wisconsin Stat. § 135.02(3)(a) states, in relevant part, as follows:

> A contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

[2] Wisconsin Stat. § 135.03 states, in relevant part, as follows: "No grantor, directly or through any officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause. The burden of proving good cause is on the grantor."

notice and the opportunity to cure in violation of Wis. Stat. § 135.04.[3] Central also petitioned for a temporary restraining order to prevent termination of the business relationship. The circuit court entered the temporary restraining order on August 27, 2001. The circuit court then granted a temporary injunction that prevented Research from terminating the relationship until March 15, 2002. The parties later stipulated that the injunction would remain in effect until the court decided Research's anticipated motion for summary judgment. Research filed a motion for summary judgment, claiming that Central was not a dealer under the WFDL because there was no community of interest between the parties.

¶ 4. The Winnebago County Circuit Court, Judge William H. Carver presiding, granted Research's motion for summary judgment. The circuit court found that Central was not a dealer under the WFDL. The court cited the following factors as relevant to its decision: (1) The parties had no written agreement; (2) Central would not be substantially harmed by the termination because it could sell comparable products; (3) Central's sale of Research's products at eight percent of its gross revenue was not enough, given relevant case law, to suggest the existence of a dealership; (4) Research did not require any specific activity of Central;

---

[3] Wisconsin Stat. § 135.04 states, in relevant part, as follows:

> Except as provided in this section, a grantor shall provide a dealer at least 90 days' prior written notice of termination, cancellation, nonrenewal or substantial change in competitive circumstances. The notice shall state all the reasons for termination, cancellation, nonrenewal or substantial change in competitive circumstances and shall provide that the dealer has 60 days in which to rectify any claimed deficiency.

and (5) Research did not require Central to make any specific investments or provide specific promotions or services. Central appealed the circuit court's judgment, and the parties stipulated that the injunction would remain in effect pending appeal.

¶ 5. In an unpublished per curiam opinion, Court of Appeals Judges Neal P. Nettesheim, Richard S. Brown, and Daniel P. Anderson affirmed the circuit court's judgment, stating that no reasonable person could conclude that Central had demonstrated that it and Research had a community of interest. The court concluded that the parties had a typical vendor-vendee relationship and that there were "no disputed material facts demonstrating a continuing financial interest and interdependence as required by the WFDL." *Central Corp.*, No. 02–1974, unpublished slip op., ¶ 7. The court noted the following factors as persuasive: (1) Research did not impose any requirements on Central; (2) Research does its own marketing and does not expect Central to advertise on its behalf; (3) Central did not make any investments that were unique to Research's products; (4) Central derives a low percentage, only eight percent, of its gross revenues from the sale of Research's products; (5) Termination of the parties' relationship will not have a significantly adverse effect on Central's financial well-being; and (6) The inventory in this case is not an unrecoverable investment. The court concluded that the parties were not interdependent, as required by the WFDL, and Central did not have a continuing financial interest with Research. Central appealed.

¶ 6. Central alleges the following: Central is an Oshkosh, Wisconsin based business that sells humidifiers, air cleaners, and zoning systems to installer contractors. Research is based in Madison, Wisconsin and

568

manufactures heating, ventilating, and air conditioning (HVAC) equipment, including Aprilaire brand products such as humidifiers, air cleaners, zone controls, and thermostats. Research does not have its own sales force or related sales equipment. As a result, it sells its products to wholesalers and depends on them to sell and distribute its products. Wholesalers then sell Research's products to installer contractors, who ultimately sell the products to homeowners and commercial builders. Research ships its products to approximately eight wholesalers in Wisconsin, including Central.

¶ 7. Although Central and Research do not have a written contract regarding the terms of their agreement, the parties have a 20–year business relationship based on their oral agreement to allow Central to distribute Research's Aprilaire products. Central sells Research's Aprilaire brand humidifiers, air cleaners, water panels, and zoning systems. Central was one of Research's leading Wisconsin wholesalers based on dollar volume of products sold. Central distributed Research's products throughout northeastern Wisconsin, primarily in the Fox River Valley area, and, approximately ten years ago, expanded its territory to include Milwaukee and Madison. Central visits approximately 100 installer contractors weekly to sell all of Central's HVAC lines, including Aprilaire.

¶ 8. Central provides Aprilaire literature and information to its contractor customers, who then pass along the information to consumers. On occasion, Research's employees will make sales calls with Central's employees in order to promote the Aprilaire product line. Central promoted the Aprilaire product line during its visits with installer contractors. The contractors contacted Central, not Research, with vari-

ous product related questions, and Central provided service to these contractors.

¶ 9. With the exception of a thermometer recently introduced by Research, Central carries no brands that directly compete with Research's products. Central maintains that the Aprilaire line is an important part of its business because the sale of such products significantly contributes to Central's profits. In 2001, Central's total sales were $5,737,000. Central's gross sales of Research's products were $427,000, with gross profits of $53,807. Sale of Aprilaire products has comprised approximately eight to nine percent of Central's sales and profits over the years.

¶ 10. Central states that, if it did not carry the Aprilaire line, it would lose business because its customers would buy from a wholesaler that stocked all of the brands they required instead of buying only a few items from multiple wholesalers.[4] It would take years for Central to replace the business and sales that the Aprilaire products bring to it.

¶ 11. Central claims that it has educated its contractor customers regarding Aprilaire products and helped to develop goodwill and brand loyalty for the product line. Central has marketed the Aprilaire line to its customers with the following slogans:    " '. . . There's Only One Name For Indoor Air Comfort;' " " 'One Powerful Brand Name For Five Great Comfort Products;' " " 'The Strength Of The Aprilaire Brand Is A Fresh

---

[4] In the court of appeals' decision in *Guderjohn v. Loewen-America, Inc.,* 179 Wis. 2d 201, 213, 507 N.W.2d 115 (Ct. App. 1993), the court noted that "[t]he loss of one vendor's line may similarly affect a vendee's sales of other lines, but that interconnected loss does not necessarily create a dealership under the WFDL." (Citation omitted).

Source of Profits;' " and " 'Now The Strength Of The Aprilaire Brand Turns Pollen And Dust Into Gold.' "

¶ 12. Although Research does not require that Central maintain a fixed amount of inventory, Central must maintain a substantial number of Aprilaire products and parts to function successfully. In January 2002, Central's inventory of Aprilaire products was valued at approximately $44,207. In May 2002, such inventory was valued at approximately $50,000–$55,000. Research also provides incentives for wholesalers to keep inventory high, such as having a sufficient amount of inventory to coincide with promotions. Moreover, Research offers discounts on large orders and does not charge freight for orders in excess of $35,000. In practice, Central has substantial inventory of Research's products that has climbed as high as $60,000–$70,000.

¶ 13. Central replaces defective parts that are covered under Research's warranties and keeps approximately $5000 of spare parts inventory on hand to do so. Although Research reimburses Central for the price of the part, Central does not make a profit on replacement parts. In addition, Central must absorb the overhead costs of warranty work such as delivery, handling, and paperwork associated with the replacement parts.

¶ 14. Central's owners built a new warehouse to store Central's inventory of products.[5] The size of the new warehouse was based on the space necessary for Central to house its inventory, including the Aprilaire line. Central leased 7000 square feet of warehouse

---

[5] John Guerts and James Trunk are the owners of Central, each being a 50 percent shareholder. Central's owners constructed the warehouse in 1992 and lease 7000 square feet of such warehouse space to Central.

space, and it claims that approximately 2000 square feet of such warehouse space was intended to store Aprilaire product inventory.

¶ 15.   Central arranges for cooperative advertising of Aprilaire products approximately twice yearly. Both Research's and Central's customers participate in covering the cost of this advertising. Central invites its installer contractor customers to participate in such advertising and to share the cost thereof. As an example, Central's customers that contribute the cost of running an Aprilaire television commercial are identified, at the end of the commercial, as businesses that sell Aprilaire products.

¶ 16.   Research closely monitors the performance of its wholesalers by conducting evaluations every 12 to 18 months. Research has never complained that Central failed to pay for, distribute, provide necessary parts for, or arrange for the promotion of the Aprilaire line. Research has registered two complaints to Central. First, Research complained that Central was not charging enough for products in the Aprilaire line, and should be more concerned with profitability. Second, Research told Central that it should stop selling its products in the Madison and Milwaukee areas. Central refused to stop selling in the areas, because such areas comprise 30 percent of its total business.[6]

## II

¶ 17.   We now consider whether there is a community of interest between Research and Central as set forth in Wis. Stat. § 135.02(3)(a). Procedurally, this case

[6] In its brief to this court, Research alleges that Central agreed to stop selling in the Madison and Milwaukee areas but continued to do so. This request may be interpreted as another obligation Research attempted to impose on Central.

turns on whether the circuit court properly granted summary judgment in favor of Research. Wisconsin Stat. § 802.08 sets forth when a circuit court may appropriately grant summary judgment. According to sec. 802.08(2), summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

¶ 18.  Although we review a grant of summary judgment independently, we use the same methodology as the circuit court. Thus, we will apply the criteria set forth in Wis. Stat. § 802.08(2). *Strasser v. Transtech Mobile Fleet Serv.,* 2000 WI 87, ¶ 30, 236 Wis. 2d 435, 613 N.W.2d 142. Our first step is to determine if the pleadings set forth a claim for relief. *Trinity Evangelical v. Tower Ins. Co.,* 2003 WI 46, ¶ 32, 261 Wis. 2d 333, 661 N.W.2d 789. If such claim is set forth, and the moving party has established a prima facie case for summary judgment, "we examine the record to determine whether there 'exist[s] disputed material facts, or undisputed material facts from which reasonable alternative inferences may be drawn, sufficient to entitle the opposing party to a trial.' " *Id.* (quoting *Grams v. Boss,* 97 Wis. 2d 332, 338, 294 N.W.2d 473 (1980)).

¶ 19.  The burden is on the moving party to prove that there are no genuine issues of material fact. *Strasser,* 236 Wis. 2d 435, ¶ 31. An issue of fact is genuine if a reasonable jury could find for the nonmoving party. *Id.,* ¶ 32. A material fact is such fact that would influence the outcome of the controversy. *Id.*

¶ 20.  The benefits and burdens of summary judgment are aptly described in the following passage:

> Summary judgment is a drastic remedy because it deprives the losing party of a trial or even an evidentiary hearing. Still, the law recognizes the cost and inconvenience of litigation, and it requires a party to plead and support its claims or defenses in a timely manner to avoid wasting resources. When a court is faced with a controversy in which no material facts are in dispute and a party's position cannot prevail as a matter of law, it has no obligation to delay judgment and thereby consume additional court time.

*Id.,* ¶ 29.

¶ 21.  Central argues that the WFDL was enacted by the legislature in order to protect small business owners against the pressures of dealing with larger companies. The WFDL must be liberally construed, Central contends, in order to give effect to the intended purpose of the legislation. Central asserts that there is a community of interest between Central and Research because there is both a continuing financial interest and interdependence between the parties. Central asserts that both it and Research have a continuing financial interest in the successful marketing and sale of Aprilaire products. Central contends that, while it was dependent upon Research to provide the products and parts for sale, Research was dependent upon Central to sell the products and provide warranty parts, because it had no personnel capable of performing such functions. Thus, Central argues that their relationship extends beyond the typical vendor-vendee relationship.

¶ 22.  Central further contends that it has demonstrated that termination of its relationship with Research would have a significant adverse impact on

Central's financial well-being. Because of the popularity of the Aprilaire brand, and Central's efforts to market Aprilaire as the premiere brand, Central argues that it would experience difficulty selling another line with the same success it experienced with the Aprilaire line. Central asserts that, since competing inferences may be drawn from the facts in this case, this case should not be resolved on summary judgment. For example, Central rejects Research's contention that it did not impose any obligations or requirements on Central.[7] Central contends that whether or not a community of interest exists should be determined by looking at the parties' dealings with each other, not just whether there was a written contract. To this end, Central points out that many expectations were placed on Central, including Research's expectation that Central deal directly with installer contractors, maintain adequate facilities with appropriate inventory to satisfy its customers' needs, be knowledgeable about the Aprilaire product line and encourage customers to purchase that line. Central claims that Research regularly evaluates its wholesalers, and that Research's district managers periodically visit Central to determine how well Central is marketing, storing, and selling the Aprilaire line. Central further claims that Research imposed territory restrictions on it because Research attempted to limit Central's sales territory to the Fox River Valley area and

---

[7] Central asserts that one of the obligations Research imposes on it is a territorial restriction since Research requested that Central stop selling in the Madison and Milwaukee areas and limit its sales to the Fox River Valley area. Moreover, Central contends that it is required to keep sufficient product and parts inventory. Central asserts that it is also required to be knowledgeable about the Aprilaire product line.

terminated the relationship when Central refused to stop selling in the Madison and Milwaukee areas.

¶ 23.  Moreover, Central contends that simply because it cannot demonstrate how much time its personnel devote exclusively to Research's products, this should not be fatal to its claim, because Central has demonstrated that it devotes more time to the Aprilaire line than to any other. Central asserts that the circuit court was incorrect in holding that the fact that Research comprised only eight to nine percent of Central's gross revenues was not enough to show a community of interest, as *Ziegler Co. v. Rexnord,* 139 Wis. 2d 593, 407 N.W.2d 873 (1987), demonstrates that such percentages may be sufficient. Given the totality of the circumstances, Central asserts that its relationship with Research is well beyond that of the typical vendor-vendee relationship. Central argues that a trial is necessary to resolve the reasonable competing inferences that can be drawn from the many facts in this case.

¶ 24.  Research contends that summary judgment was appropriate in this case, because Central was unable to demonstrate a genuine issue of material fact. Research argues that whether there is a community of interest in this case is not a genuine issue of material fact, but a legal issue. Research asserts that the lower courts' decisions were not contrary to *Ziegler.* Research contends that the court of appeals simply concluded that there was no genuine issue of material fact regarding a continuing financial interest and interdependence.

¶ 25.  Research asserts that Central has not proven interdependence, as most of the evidence it cites, such as keeping sufficient Aprilaire inventory on hand, are common in a typical vendor-vendee relationship. Research contends that a substantial financial

investment is needed to distinguish a dealership from a vendor-vendee relationship, and no such investment is present in this case. Research also argues that there is no community of interest here, because there is no continuing financial interest between the parties or interdependence. Central is unable to demonstrate, Research contends, that a large portion of its business is devoted to Research's products, or that it has acquired substantial specialized assets for Research's goods. Research argues that Central has not demonstrated that it has a financial investment in equipment, vehicles, or inventory exclusively related to Research's products.

¶ 26.  Moreover, Research contends that a community of interest must be based on the actions of both parties, and cannot be unilaterally created by the actions of one party alone. Although Research depends on wholesalers to get its products to installer contractors, it contends that it is not solely dependent on Central to perform this task, since Central was not the only wholesaler in the applicable territory. Research cautions that a community of interest cannot be found in every case where a manufacturer relies on a wholesaler to sell its products. Research further asserts that Central has not demonstrated that termination of its dealings with Research would have a substantial adverse effect on its business, since even if Central could demonstrate loss of future profits, this factor alone is not enough to suggest anything more than a vendor-vendee relationship. More important, Research suggests, is the fact that Central has been unable to give the court any specifics regarding the amount of potential sales it would lose by termination of the relationship.

¶ 27. Research states that the facts in this case are not in dispute. Research contends that, although Central claims that Research imposes numerous obligations on it, the reality is that none of these is enforceable under contract. Research claims that the only requirement it imposes on Central is that Central must pay for all of its shipments by the tenth of every month. Research argues that Central's bald statement that it devotes more time to the Aprilaire line than to any other product line does not satisfy any test under the WFDL. Research further contends that because its products comprise such a small percentage of Central's revenues, termination of the relationship would not imperil Central's financial well-being. Research asserts that Central is not assigned an exclusive sales territory, and the fact that Research asked Central to confine its sales to the Fox River Valley does not create a material issue as to whether a dealership existed. Research argues that Central did not invest in goodwill, since it did not buy a franchise, for example, and there is no unrecoverable investment, since Central can sell its Aprilaire inventory until it is depleted. Research further argues that Central's use of its logo or trademark is de minimus, since it only distributes a small amount of Research's literature. Finally, Research contends that Central has overstated its work with replacement parts for the Aprilaire line, and contends that Central merely provides the Aprilaire parts and that Central does not repair, install, or remove defective parts.

¶ 28. Chapter 135 of the Wisconsin Statutes is appropriately referred to as the Wisconsin Fair Dealership Law. Wis. Stat. § 135.01.[8] The WFDL's purposes are to promote the public's interest in the relationships between dealers and grantors, and to protect dealers from unfair treatment by grantors, who may use their superior economic and bargaining powers to the disadvantage of small business owners. Wis. Stat. § 135.025(2)(a) and (b).[9] To this end, the WFDL "shall be liberally construed to promote its underlying remedial purposes and policies." Wis. Stat. § 135.025(1). *See also Jungbluth v. Hometown, Inc.*, 201 Wis. 2d 320, 328, 548 N.W.2d 519 (1996). While the WFDL has been characterized as protectionist in nature, because it regulates the free market, we note that it is up to the legislature to determine such policy matters. To this end, we must apply the policy adopted by the legislature.

██

¶ 29. In order to determine if the WFDL applies to a given business relationship, the court must determine if the parties' relationship could, in fact, be

[8] Wisconsin Stat. § 135.01 states, in relevant part, as follows: "This chapter may be cited as the 'Wisconsin Fair Dealership Law.' "

[9] Wisconsin Stat. § 135.025(2) states, in relevant part, as follows:

The underlying purposes and policies of this chapter are:

(a) To promote the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis;

(b) To protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships.

characterized as a dealership with one party being the dealer and the other the grantor of the dealership. Although "dealer"[10] is clearly defined in the WFDL, "dealership" is given a slightly more complex definition. *See Baldewein v. Tri-Clover, Inc.,* 2000 WI 20, ¶ 12, 233 Wis. 2d 57, 606 N.W.2d 145. In summary, a dealership, as set forth in Wis. Stat. § 135.02(3)(a), is comprised of the following elements: "(1) a contract or agreement; (2) which grants the right to sell or distribute goods or services, or which grants the right to use a trade name, logo, advertising or other commercial symbol; and (3) a community of interest in the business of offering, selling or distributing goods or services." *Bakke Chiropractic Clinic v. Physicians Plus Ins.,* 215 Wis. 2d 605, 613, 573 N.W.2d 542 (Ct. App. 1997) (citing *Kania v. Airborne Freight Corp.,* 99 Wis. 2d 746, 763, 300 N.W.2d 63 (1981)).

¶ 30. The most vexing element of Wis. Stat. § 135.02(3)(a) has been the "community of interest" language, because it has not resulted in the development of a bright line rule. *See Baldewein,* 233 Wis. 2d 57, ¶ 13. Section 135.02(1) provides that a community of interest "means a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services." Yet this court has concluded that the hallmarks of a community of interest are best discerned from examining this definition in conjunction with the definition of "dealership, sec. 135.02(3), and the legislatively enumerated purposes and policies of WFDL set forth in sec. 135.025(2)." *Ziegler,* 139 Wis. 2d at 603–04.

---

[10] Wisconsin Stat. § 135.02(2) states, in relevant part, as follows: " 'Dealer' means a person who is a grantee of a dealership situated in this state."

¶ 31. In *Ziegler*, we reversed the circuit court's grant of summary judgment and concluded that "[t]he legislature consciously defined the phrase community of interest to encompass an extraordinarily diverse set of business relationships not limited to the traditional franchise." *Id.* at 602. We have rejected any rigid tests that would exclusively rely on percentages to determine whether a community of interest exists. *Id.* at 603. *See also Baldewein,* 233 Wis. 2d 57, ¶ 29. Instead, we have set forth two guideposts which, if satisfied, would lead to the conclusion that the parties shared a community of interest.

¶ 32. One such guidepost is whether the parties share a continuing financial interest. *Ziegler,* 139 Wis. 2d at 604. The other guidepost is whether the parties share an interdependence, which may be characterized as "the degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship." *Id.* at 605. When construed together, these guideposts must reveal an interest in a business relationship great enough to threaten the financial health of the dealer, if the grantor were to decide to exercise its power to terminate. *Id.* These stringent requirements are intended to weed out the typical vendor-vendee relationship. *Baldewein,* 233 Wis. 2d 57, ¶ 25.

¶ 33. In *Ziegler,* we stressed the importance of considering all facets of a business relationship, as reflected in the parties' actual dealings, and not limiting the inquiry to one deficient factor. *Ziegler,* 139 Wis. 2d at 605–06. We enumerated the facets that should be considered to determine whether there is a community of interest, and they are as follows:

581

[H]ow long the parties have dealt with each other; the extent and nature of the obligations imposed on the parties in the contract or agreement between them; what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services; the extent and nature of the alleged grantor's grant of territory to the alleged dealer; the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; the personnel which the alleged dealer devotes to the alleged dealership; how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services.

*Id.* at 606.

¶ 34. While the abovementioned list does not recite every factor that may be considered, it does provide questions that are useful in determining whether a community of interest exists.[11]

---

[11] Wisconsin Civil Jury Instruction 2769 relies on the factors set forth in *Ziegler Co. v. Rexnord,* 139 Wis. 2d 593, 407 N.W.2d 873 (1987). In aiding the jury in reaching a determination regarding whether a community of interest exists, the instruction sets forth, in relevant part, the following considerations:

In determining if a community of interest existed between (*dealer*) and (*grantor*), among the things you should consider are:

How long the parties dealt with each other;

¶ 35. Given the factors from *Ziegler,* as also reiterated in the jury instruction, and the facts as set forth in the record, we conclude that several facets of the relationship between Research and Central present genuine issues of material fact and/or result in disputed or competing inferences in regard to Central's contention that the parties' shared a community of interest. We conclude that the parties' 20–year business relationship is a significant factor to be considered. In addition, the financial investment made by Central's owners in its warehouse facilities should be considered, since it appears that Central based the size of its warehouse, in part, on the amount of Aprilaire inventory it stored.[12] The dispute as to the Madison and Milwaukee areas

---

The extent and nature of the obligations imposed on the parties in any contract or agreement between them;

The percentage of time or revenue the (*dealer*) devoted to (*grantor*)'s products or services;

The percentage of the gross proceeds or profits (*dealer*) derived from (*grantor*)'s products or services;

The extent and nature of (*grantor*)'s grant of territory to (*dealer*);

The extent and nature of (*dealer*)'s uses of (*grantor*)'s proprietary marks (such as trademarks or logos);

The extent and nature of (*dealer*)'s financial investment in inventory, facilities, and good will of the alleged dealership;

The personnel which (*dealer*) devotes to the alleged dealership;

How much (*dealer*) spent on advertising or promotional expenditures for the (*grantor*)'s products or services;

The extent and nature of any supplementary services provided by (*dealer*) to consumers of (*grantor*)'s products or services.

[12] It appears that this facet presents a genuine issue of material fact as to the question of increased lease cost to

leads us to conclude that Central may also be able to demonstrate that it had a specific sales territory. Such a grant could be inferred from Research's attempt to limit Central's sales to the Fox River Valley. Moreover, the only humidifier Central stocked was Research's Aprilaire brand. Other claims that lead to the conclusion that there are genuine issues of material fact and reasonable alternative inferences to be drawn from undisputed material facts that bear on the question of whether there is a community of interest are: Central kept a supply of spare parts on hand to serve its installer contractor customers with any problems that they may experience with the Aprilaire brand; Central made no profits on such parts, as it sold them to its customers at cost; Central kept a substantial amount of Aprilaire inventory in its warehouse at any given time. While we recognize that the sale of Research's products does not comprise a large percentage of Central's gross revenues or profits, this fact alone is not dispositive, but is a matter to be weighed by the trier of fact.

■

¶ 36.  We conclude that, since there are genuine issues of material fact and reasonable competing inferences that may be drawn from undisputed material facts in the case at hand, this case should not have been resolved by the granting of summary judgment. As discussed earlier in this opinion, summary judgment is an exacting standard that is not lightly satisfied. While we do not conclude that Central must prevail, we do conclude that this case should proceed to trial, so that a fact finder may determine whether a community of

---

Central due to its claim that its owners had to build new warehouse space to house its inventory, including Research's Aprilaire products.

interest, and, therefore, a dealership relationship, existed between Research and Central.

## III

¶ 37.   In sum, we conclude that summary judgment was improperly granted to Research. Genuine issues of material fact exist here, along with reasonable alternative inferences drawn from undisputed material facts, so that a trial is warranted in this case to determine whether a community of interest exists and, therefore, whether there is a dealership relationship between Central and Research under the Wisconsin Fair Dealership Law. Where there are genuine issues of material fact or reasonable alternative inferences drawn from undisputed material facts, the determination of whether there is a community of interest is one which will be made by the trier of fact, based on an examination of all of the facets of the business relationship.

*By the Court.*—The decision of the court of appeals is reversed, and the cause remanded to the circuit court for further proceedings consistent with this opinion.

¶ 38.   JON P. WILCOX, J., and DIANE S. SYKES, J., did not participate.