PER CURIAM.
¶1 This appeal involves two claims made by Barbara Maloney, as personal representative of the Estate of Thomas R. Maloney (the Estate), against Francis and William Maloney. First, Barbara asserted a partition claim, asking the circuit court to order the sale of real property that the Estate, Francis, and William owned as tenants in common. Second, Barbara made a claim against Francis and William in their capacities as co-trustees of the Mary A. Maloney Family Trust (the Trust), asserting the Estate was entitled to Thomas Maloney's share of the Trust's assets. The circuit court granted Barbara summary judgment on both claims and subsequently denied Francis and William's motion for reconsideration.
¶2 We conclude a genuine issue of material fact exists as to whether the real property owned by the Estate, Francis, and William can be divided into parcels of approximately equal value. We therefore reverse that portion of the circuit court's decision ordering the sale of the property, and we remand for further proceedings on Barbara's partition claim. However, we conclude the court properly granted summary judgment to Barbara on her claim regarding the distribution of Thomas's share of the Trust's assets. We therefore affirm the court's decision granting Barbara summary judgment on that claim.
BACKGROUND
¶3 Barbara is Thomas Maloney's surviving spouse and is the personal representative of his estate. Francis and William were Thomas's brothers. The Trust is an irrevocable trust that was created on November 25, 1987, by Mary Maloney, who was Francis, William, and Thomas's mother. Thomas was the sole original trustee of the Trust. He was a licensed attorney and certified public accountant who worked for at least eight years in the area of estate planning law.
¶4 Mary transferred certain real estate to the Trust upon its creation. She was the sole beneficiary of the Trust during her lifetime. As grantor, Mary reserved a testamentary power of appointment (POA) over the Trust's assets. Upon Mary's death, the trustee was to "distribute the remaining assets of the Trust Estate to such person, persons, or entities ... as Grantor shall appoint and designate to receive the same by a Last Will and Testament in which specific reference is made to this power of appointment." If Mary did not exercise her testamentary POA, the trustee was to "retain the Trust Estate assets not so appointed to be held and distributed in accordance herewith."
¶5 Mary died on March 5, 1999. It is undisputed that she did not exercise her testamentary POA, as she did not specifically refer to it in her will. As such, the treatment of the Trust's assets following Mary's death was governed by § 3.1 of the Trust, which provided:
After the death of the Grantor a Trust share shall be created for each living child and a Trust share for each deceased child with then living issue, excluding Daniel P. Maloney and if deceased, his spouse and his then living issue. The Trust share of each living child shall then be distributed to that child. The Trustees shall also then distribute, for each Trust share of a deceased child, the remaining balance of his Trust share to such person or persons among said child's spouse and the Grantor's then and thereafter living issue, upon such conditions and estates, in trust or otherwise, in such manner and at such time or times as said child appoints or directs in his Will specifically referring to this power of appointment. In default of the exercise of such appointment or to the extent such power is not effectively exercised, the Trustees shall distribute the balance of such Trust share to said child's then living issue by right of representation.
¶6 Following Mary's death, Thomas, acting as trustee, created a trust share for each of Mary's children, except Daniel, by assigning each child a 25% equitable interest in the Trust's remaining assets. Thomas did not actually transfer any of the Trust's assets to the beneficiaries. In each subsequent year, he allocated 25% of the Trust's net income to each beneficiary. Actual cash payments of the allocated net income were made to the beneficiaries at Thomas's discretion.
¶7 Thomas died intestate on February 19, 2014. Upon his death, Francis and William became successor trustees of the Trust. Because Thomas died intestate and therefore did not exercise the testamentary POA granted to him by § 3.1 of the Trust, Francis and William took the position that Thomas's three children-Christopher, Elizabeth, and Patrick Maloney-were entitled to his 25% equitable interest in the Trust. However, in August 2016, Christopher, Elizabeth, and Patrick each signed a document stating that they consented to Thomas's interest in the Trust being distributed to the Estate and that they waived any right to argue they had an interest in the Trust.
¶8 Barbara then filed the instant lawsuit against Francis and William, seeking an order requiring them to distribute Thomas's share of the Trust assets to the Estate. Barbara also sought an order regarding approximately 314 acres of farmland that the Estate, Francis, and William owned as tenants in common. Barbara alleged she had attempted to negotiate with Francis and William to either divide or sell that real estate, but they refused to do so. She therefore asked the circuit court to order either partition or sale of the commonly owned property.
¶9 Both sides subsequently moved for summary judgment. With respect to her claim regarding distribution of the Trust's assets, Barbara argued the Trust's plain language required that its assets be distributed to the beneficiaries at the time of Mary's death. Barbara argued that distribution "should have been accomplished during [Thomas's] lifetime," and Francis and William were therefore required to distribute Thomas's share of the Trust's assets to the Estate. She contended § 3.1 of the Trust allowed Thomas's share to be distributed to his children only if he predeceased Mary.
¶10 In response, Francis and William asserted the Trust "did not require the Trustee to distribute the Trust Corpus to all beneficiaries at the time of [Mary's] death." They argued the trustee instead had "absolute discretion to determine when and whether to distribute Trust assets to any beneficiary under the Trust." Francis and William also argued that because Thomas did not exercise his testamentary POA, § 3.1 of the Trust required them to distribute his share of the Trust to his children.
¶11 Barbara also sought summary judgment on her partition claim. Relying on an appraiser's affidavit, she asserted: (1) the presence of irrigation systems made the physical division of the commonly owned property impossible; (2) each irrigated section of the property would need to be sold as a whole; and (3) the irrigated property was more valuable than the nonirrigated property. For these reasons, Barbara argued the only reasonable remedy was "the sale of the entire property." Relying on Francis's affidavit, Francis and William responded that the property could be divided into parcels of approximately equal value and therefore did not need to be sold.
¶12 The circuit court ultimately granted summary judgment in favor of Barbara. The court concluded § 3.1 of the Trust "clearly and unambiguously required that at the time of Mary's death, a Trust share was to be created for each living child and that Trust share distributed to that child ." The court also agreed with Barbara that § 3.1 allowed distribution of Thomas's share to his children only if he predeceased Mary. The court concluded, "Because [Thomas] obviously did not predecease [Mary], and because as above, Thomas's share had to have been distributed to him, his estate is the proper beneficiary of his [Trust] share." The court therefore ordered Thomas's share of the Trust's assets distributed to the Estate. The court did not directly address Barbara's partition claim in its summary judgment decision. However, the court granted Barbara's summary judgment motion, which had asked the court to order a sale of the commonly owned property.
¶13 Francis and William moved for reconsideration. They argued the circuit court had erred by granting summary judgment on the partition claim because there was "a material factual dispute regarding whether physical division of the property [was] impossible." Francis and William also argued the court had erred in various ways when interpreting the Trust. The court denied Francis and William's motion for reconsideration, and this appeal follows.
DISCUSSION
¶14 We review a grant of summary judgment independently, using the same methodology as the circuit court. Hardy v. Hoefferle , 2007 WI App 264, ¶6, 306 Wis. 2d 513, 743 N.W.2d 843. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2) (2017-18).[1]
I. Partition claim
¶15 On appeal, Francis and William first assert that the circuit court erred by granting Barbara summary judgment on her partition claim. "A person having an interest in real property jointly or in common with others may sue for judgment partitioning such interest unless an action for partition is prohibited elsewhere in the statutes or by agreement between the parties for a period not to exceed 30 years." WIS. STAT. § 842.02(1).
¶16 A circuit court has three alternatives in a partition action. LaRene v. LaRene , 133 Wis. 2d 115, 119-20, 394 N.W.2d 742 (Ct. App. 1986). First, the court may find that the location for partition is clear and order a partition along that line. Id. at 119. Second, the court may find that a suitable location for partition is not clear and may appoint a referee to resolve that issue. Id. Third, the court may determine as a matter of law that partition is impossible and order the property sold. Id. at 119-20.
¶17 In this case, Barbara asserted that physical division of the commonly owned real estate was impossible and the circuit court should therefore order a sale of that property. In support of her position, Barbara relied on the affidavit of appraiser LeRoy Jones. Jones noted that one portion of the commonly owned real estate was served by one irrigation system, while another portion of the property was served by a different irrigation system. He opined that the portions of the property served by these irrigation systems were more valuable than the remaining, nonirrigated land. He further explained that the land served by each irrigation system could not be divided. For these reasons, he asserted it was "impossible to physically separate the property so that it would [be] fairly divided among multiple owners."
¶18 In response, Francis and William relied on Francis's affidavit in support of their position that it was possible to divide the commonly owned property into smaller parcels of equal value. Francis averred that he was born in 1944, that he "grew up on" the commonly owned property, that he "helped farm the property" beginning in 1951, and that he "moved away" in 1970 but "kept [himself] informed regarding the farming operations on the property." He averred that the irrigation systems on the property were approximately thirty-five years old, and based on Internal Revenue Service regulations, they had a useful life of fifteen to twenty years. He averred the irrigation systems "[did] not add significant value to the property because of their age." Francis further averred that the lifespan of the wells on the property was uncertain because the water table was dropping, and three years prior one well had run dry and had to be drilled deeper to reach the water table. Francis averred that the salvage value of the "wells/irrigation equipment" was approximately $ 15,000 each. He also asserted that 120 acres of the property were not irrigated. For these reasons, Francis opined that the property did not need to be sold because it could be divided into parcels of approximately equal value.
¶19 We agree with Francis and William that Francis's affidavit was sufficient to raise a genuine issue of material fact as to whether the commonly owned property could be divided into smaller parcels of approximately equal value. The general rule in Wisconsin is that a nonexpert property owner may testify concerning the value of his or her property. Perpignani v. Vonasek , 139 Wis. 2d 695, 737, 408 N.W.2d 1 (1987). The weight given to the owner's testimony is for the trier of fact to determine. Id.
¶20 Here, a reasonable factfinder could rely on Francis's affidavit to conclude that the presence of the irrigation systems did not materially affect the value of the commonly owned property and, consequently, did not prevent that property from being divided into parcels of approximately equal value. Summary judgment was thus inappropriate, because a reasonable factfinder could have found that partition of the property was possible, and a sale of the property was therefore unnecessary. See Central Corp. v. Research Prods. Corp. , 2004 WI 76, ¶19, 272 Wis. 2d 561, 681 N.W.2d 178 (noting an issue of fact is genuine if a reasonable jury could find for the nonmoving party). As such, we reverse the circuit court's grant of summary judgment ordering a sale of the commonly owned property, and we remand for further proceedings on Barbara's partition claim.
II. Claim for distribution of Thomas's share of the Trust
¶21 Francis and William next argue the circuit court erred by granting Barbara summary judgment on her claim regarding the distribution of Thomas's share of the Trust. The court agreed with Barbara that under the Trust's unambiguous terms, Francis and William were required to distribute Thomas's share of the Trust's assets to the Estate. Francis and William argue the Trust instead requires them to distribute Thomas's 25% equitable share of the Trust to his three children.
¶22 The interpretation of a trust instrument presents a question of law that we review independently. See Furmanski v. Furmanski , 196 Wis. 2d 210, 214, 538 N.W.2d 566 (Ct. App. 1995). The primary aim of trust interpretation is to ascertain the grantor's intent, and the best evidence of that intent is found in the language of the trust. Id. at 215.
¶23 In this case, it is undisputed that Mary did not exercise the testamentary POA described in § 2.4 of the Trust, as she did not specifically refer to the testamentary POA in her will. Under these circumstances, § 2.4 unambiguously provides that the trustee "shall retain the Trust Estate assets not so appointed to be held and distributed in accordance herewith"-i.e., in accordance with the other provisions of the Trust.
¶24 Section 3.1 of the Trust, in turn, provides that after Mary's death, a "Trust share" shall be created for each of Mary's living children and for each deceased child with living issue, except for Daniel. The Trust share of each living child "shall then be distributed to that child." The meaning of this language is plain and unambiguous. After Mary's death, the trustee was to create a share of the Trust for each living child and each deceased child with living issue, except Daniel, and was then to "distribute[ ]" each living child's share to that child. Thus, following Mary's death, a share of the Trust's assets should have been created for and transferred to Thomas.
¶25 Francis and William argue the word "distribute" in § 3.1 of the Trust did not require the actual transfer of the Trust's assets to the beneficiaries following Mary's death. Instead, they argue the trustee was merely required "to divide the Trust into Trust shares, creating a beneficial fractional Trust share for each of [Mary's] children, except Daniel." Under Francis and William's interpretation, the trustee "would continue to hold legal title to the Trust assets, but each child would hold equitable title to the child's fractional share in the Trust assets." They contend the trustee would have discretion to distribute the Trust income and corpus to the beneficiaries.
¶26 We reject Francis and William's interpretation of the term "distribute" for two reasons. First, § 3.1 makes no distinction between legal title-retained by the trustee-and equitable title-transferred to the beneficiaries. It simply requires the trustee to create shares of the Trust and distribute them to the beneficiaries. Under these circumstances, a commonsense reading of § 3.1 indicates that the word "distribute" refers to transferring the legal interest in the Trust's assets to the beneficiaries, rather than simply granting the beneficiaries equitable title to those assets.
¶27 Second, the word "distribute" is also used in Article X of the Trust, which provides that if the market value of the Trust's assets falls below $ 25,000, the trustee may terminate the Trust and "distribute the assets in accordance with the terms set forth in Article II and Article III, whichever is applicable." In this provision, the word "distribute" clearly refers to a transfer of the Trust's assets to the beneficiaries. Article X therefore supports our conclusion that § 3.1 required the trustee to transfer the Trust's assets to the beneficiaries after Mary's death.
¶28 Francis and William cite § 6.12 of the Trust, which grants the trustee the power to "make any distribution or division of the Trust property in cash or in kind or both" and to "make any such distribution or division without regard to the income tax basis of specific property allocated to any beneficiary including any Trust." They argue that because § 6.12 uses the terms distribution and division "interchangeably," the word "distribute" in § 3.1 must mean "division or allocation into shares." To the contrary, however, § 6.12's references to "distribution or division," in the disjunctive, actually suggest that those terms have different meanings within the context of the Trust. Section 6.12 therefore undercuts Francis and William's argument that § 3.1 merely requires the division or allocation of the Trust's assets.
¶29 Francis and William also cite the last sentence of § 5.1 of the Trust, which provides that the trustee has "absolute discretion" to "determine the frequency of distributions, if any, to any beneficiary hereunder." However, we agree with the circuit court that, reading §§ 3.1 and 5.1 together, the most reasonable interpretation of the language quoted above is that it was intended to give the trustee discretion over the distribution of the Trust's assets during Mary's lifetime. In contrast, § 3.1 imposes an absolute duty on the trustee to distribute shares of the Trust's assets to Mary's living children after her death.[2]
¶30 Francis and William next observe that § 3.1 requires the trustee to create and distribute Trust shares to the beneficiaries "[a]fter" Mary's death, not "upon" Mary's death or "at the time of" Mary's death. They contend this distinction shows that Mary intended the Trust to continue after her death and that she did not intend the immediate distribution of the Trust's assets to the beneficiaries. However, as Barbara notes, § 3.1 distinguishes between Mary's living and deceased children. The only reasonable reading of § 3.1 is that the distinction between Mary's living and deceased children is made at the time of her death, not at some nebulous point in the future. For this reason, we agree with Barbara that the word "after" in § 3.1 means at the time of Mary's death. Moreover, we agree with Barbara that Francis and William's interpretation of the word "after" is unreasonable, as it would essentially permit the trustee to continue the Trust in perpetuity, without making the distributions required by § 3.1.
¶31 Francis and William also argue that if § 3.1 required the Trustee to distribute all of the Trust's assets to the beneficiaries at the time of Mary's death, that action would effectively terminate the Trust because "no purpose of the Trust would remain to be achieved." They argue termination of the Trust is not possible because all beneficiaries have not consented to the termination, as required by WIS. STAT. § 701.0411(1), and no court has made the findings required by § 701.0411(6). In making this argument, Francis and William fail to address WIS. STAT. § 701.0410(1), which provides that "[i]n addition to the methods of termination prescribed by ss. 701.0411 to 701.0414, a trust terminates to the extent the trust is revoked or expires pursuant to its terms." Here, § 3.1 evidences Mary's intent that, if all of her children remained alive at the time of her death, the Trust's assets should be distributed to them and the Trust should terminate.[3]
¶32 Francis and William emphasize that Thomas acted as trustee for fifteen years after Mary's death, and during that time he did not distribute the Trust's assets to the beneficiaries. They further note that no beneficiary objected to Thomas's actions during that fifteen-year period. However, our aim in interpreting the Trust is to ascertain Mary's intent. See Furmanski , 196 Wis. 2d at 215. Francis and William do not explain why Thomas's actions in the years following Mary's death-or the other beneficiaries' failure to object-are relevant to that inquiry.
¶33 Because § 3.1 of the Trust unambiguously required the trustee to distribute a share of the Trust's assets to each of Mary's living children following her death, Thomas was entitled to receive his share at that time. Regardless, Francis and William argue that because Thomas did not exercise the testamentary POA granted by § 3.1, that section requires them to distribute Thomas's share to his children. They assert they have no authority to distribute his share to the Estate.
¶34 We disagree. Section 3.1 begins by stating that, after Mary's death, a Trust share shall be created for each of Mary's living children and for each of her deceased children with living issue, except Daniel. The Trust share of each living child "shall then be distributed to that child." These are the only provisions of § 3.1 that apply to the distribution of Thomas's Trust share.
¶35 Section 3.1 then goes on to state that the trustee shall distribute each Trust share "of a deceased child" "to such person or persons ... in such manner and at such time or times as said child appoints or directs in his Will specifically referring to this power of appointment." "In default of the exercise of such appointment or to the extent such power is not effectively exercised, the Trustees shall distribute the balance of such Trust share to said child's then living issue by right of representation." These provisions unambiguously apply only to children who predeceased Mary. They are therefore inapplicable to Thomas.[4]
¶36 In summary, we conclude § 3.1 of the Trust unambiguously required that Thomas's share of the Trust's assets be distributed to him at the time of Mary's death. Furthermore, because Thomas did not predecease Mary, § 3.1 does not require Francis and William to distribute Thomas's share to his children. The Estate is therefore entitled to Thomas's share of the Trust's assets, and we affirm that portion of the circuit court's decision ordering Francis and William to distribute Thomas's share to the Estate.
¶37 No WIS. STAT. RULE 809.25 costs are allowed to the parties.
By the Court. -Orders affirmed in part; reversed in part and cause remanded for further proceedings.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

As Francis and William point out, § 5.1 of the Trust also discusses payments to beneficiaries who are minors. However, such payments could occur if a child who predeceased Mary had living issue who were minors at the time of Mary's death.

The same would not necessarily be true if any of Mary's children predeceased her. Section 3.1 requires the trustee to distribute the Trust share of a child who predeceased Mary "to such person or persons among said child's spouse and the Grantor's then and thereafter living issue, upon such conditions and estates, in trust or otherwise, in such manner and at such time or times as said child appoints or directs in his Will specifically referring to this power of appointment." (Emphasis added.) Under this provision, depending on the terms of the deceased child's will, the trustee could be required to delay distributing some or all of the deceased child's share until a later date.

Francis and William argue a child who predeceased Mary could not have exercised the testamentary POA in § 3.1 because before Mary's death each child had only a "contingent remainder interest" in the Trust and therefore would have had "no interest to appoint at the time of the child's death." However, Francis and William cite no legal authority in support of the proposition that a child who predeceased Mary could not have conveyed his or her contingent remainder interest in the Trust via his or her will. We need not address arguments that are unsupported by references to legal authority. See State v. Pettit , 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).