In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3821

Praefke Auto Electric &
Battery Company, Inc.,

Plaintiff-Appellee,

v.

Tecumseh Products Company, Inc.,

Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 99 C 830--Lynn Adelman, Judge.

Argued February 26, 2001--Decided June 29, 2001


  Before Bauer, Posner, and Kanne, Circuit
Judges.

  Posner, Circuit Judge.  Tecumseh Products
Company, the defendant in this diversity
suit for violation of Wisconsin's Fair
Dealership Law, Wis. Stat. ch. 135,
appeals from the grant of a preliminary
injunction to the plaintiff, Praefke Auto
Electric & Battery Company. 110 F. Supp.
2d 899 (E.D. Wis. 2000). The injunction,
ten pages long with 31 numbered
paragraphs, requires Tecumseh to
reappoint Praefke as a Tecumseh
"Authorized Service Distributor" even
though it had never appointed Praefke in
the first place, and to provide Praefke
with the services that Tecumseh's
"Central Warehouse Distributors" provide
Authorized Service Distributors even
though Tecumseh is not a Central
Warehouse Distributor but is instead the
Central Warehouse Distributors' supplier.
This relief is unprecedented and, as we
shall see, improper.

  Tecumseh manufactures small gasoline
engines used in lawnmowers, snowblowers,
and similar machines. It sells
replacement parts for its engines to
warehouse distributors, which it calls
Central Warehouse Distributors. The CWDs
in turn sell both directly to dealers,
called Registered Service Dealers, and
indirectly to them via Authorized Service

Distributors, which are wholesalers that resell to Registered Service Dealers. For simplicity, we'll call these three tiers of distributor "warehouse distributors," "wholesalers," and "retailers." Ordinarily a warehouse distributor sells to wholesalers at a lower price than it sells to retailers, so that the wholesaler can resell at a profit to the retailers.

Tecumseh does not select the wholesalers or have a contract with them, but its contracts with the warehouse distributors entitle it to veto a warehouse distributor's choice of a wholesaler to resell to. Tecumseh gives the warehouse distributors a form contract to use in contracting with wholesalers and issues each approved wholesaler a certificate describing him as a Praefke dealer and authorizing him to do warranty work on Praefke engines. The form contract contains a space for Tecumseh to sign to signify its approval of the wholesaler, but also states that Tecumseh is not a party to the contract. Tecumseh does some joint advertising with the wholesalers but in general its contacts with them are quite limited and sporadic. Although it suggests retail prices for the wholesalers to charge for Tecumseh replacement parts, it makes no attempt to bring about compliance with those prices, as it has no authority to terminate a wholesaler--indeed it has no contractual rights over the wholesalers at all, once they are appointed, and it extracts no commitments from them. Crucially, it does not control the prices at which warehouse distributors resell to wholesalers.

In 1987 one of the warehouse distributors, Industrial Engine, appointed Praefke, which carries a number of different producers' lines, to be a wholesaler of Tecumseh parts. The contract (which, remember, is a form contract furnished to the warehouse distributors by Tecumseh) provided that it would terminate automatically if Industrial's contract with Tecumseh terminated. Twelve years later, Tecumseh terminated its contract with Industrial Engine, a move that automatically canceled Praefke's appointment as a Tecumseh wholesaler. Tecumseh appointed a new warehouse distributor, Central Power, to serve the same territory as the old. Central Power decided to sell directly to

retail dealers, and so it did not reappoint Praefke as a wholesaler. It was perfectly willing to continue to sell Tecumseh parts to Praefke, and Tecumseh was perfectly content for Praefke to continue selling those parts at retail and performing warranty repairs of Tecumseh engines. But Central Power would not give Praefke a discount for being a wholesaler, instead charging Praefke the same price it charged retail dealers. The denial of the wholesaler discount made it more difficult for Praefke to profit from reselling Tecumseh parts and precipitated this suit, in which Praefke argues that despite the absence of a contract with Tecumseh it was a franchisee of Tecumseh terminated without cause, in violation of the dealership law.

The district judge issued a preliminary injunction (which has been stayed, however, pending this appeal) because he thought that Praefke was likely to prevail in an eventual trial and that the balance of irreparable harms favored it over Tecumseh. Actually there was no showing that Praefke would incur irreparable harm if the preliminary injunction wasn't issued. Praefke continues to buy Tecumseh parts from Central Power and to resell them to dealers; there has been no disruption of its dealer network. The higher price that it pays for the Tecumseh parts that it resells has reduced its profits, its price to dealers being constrained by the fact that they can buy parts from Central Power at the same price that Praefke has to pay. But because Tecumseh parts are only a small part of Praefke's business (about 13 percent of its total sales revenues and a slightly higher percentage of its profits, before Central Power replaced Industrial Engine), Praefke's profits have not fallen to a point that threatens its solvency. Its losses are purely financial, easily measured, and readily compensated. There is therefore no showing of irreparable harm, Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 386 (7th Cir. 1984), and on this ground alone the preliminary injunction should have been denied.

But in addition Tecumseh did not violate the fair dealership statute when, by terminating Industrial, it precipitated Praefke's loss of a wholesaler discount. Praefke was not a Tecumseh dealer, and so

the statute is inapplicable. A dealership, so far as bears on this case, is created by (1) a "contract or agreement, either express or implied, whether oral or written," by which (2) "a person is granted the right to sell or distribute goods or services," in which (3) there is "a community of interest in the business of offering, selling or distributing goods or services." Wis. Stat. sec. 135.02(3)(a). The second requirement is satisfied here, but not the other two requirements. There was no contract between Tecumseh and Praefke. The contract was between Industrial and Praefke. Tecumseh insisted on a right of approval of Industrial's subdistributors because they would be distributing Tecumseh's parts at wholesale, a responsible function that if performed incompetently could injure Tecumseh's reputation. By reserving this right, Tecumseh was not making any commitments to Praefke.

   True, the statute is explicit that the dealership contract doesn't have to be written, or even express, id.; it can thus be inferred from a course of dealing. See California Wine Ass'n v. Wisconsin Liquor Co., 121 N.W.2d 308, 315 (Wis. 1963); Wojahn v. National Union Bank, 129 N.W. 1068, 1075-76 (Wis. 1911); Bong v. Cerny, 463 N.W.2d 359, 362 (Wis. App. 1990); Schaller v. Marine Nat'l Bank, 388 N.W.2d 645, 649 (Wis. App. 1986); Restatement (Second) of Contracts sec. 4, comment a (1981); E. Allan Farnsworth, Contracts sec. 3.10, pp. 132-33 (3d ed. 1999). The dealings between Tecumseh and Praefke were slight and intermittent; but that is an aside. To infer a contract from a course of dealing requires evidence of an intention by both sides to make legally enforceable commitments. E.g., Bong v. Cerny, supra, 463 N.W.2d at 362; Schaller v. Marine Nat'l Bank, supra, 388 N.W.2d at 649. There is no evidence of such an intention here. One can see this by asking in what circumstances Praefke might have sued Tecumseh, or Tecumseh Praefke, for breach of contract. Tecumseh couldn't have sued Praefke for selling below or above a particular price, for selling outside a particular territory, for selling to dealers assigned to other distributors, for not selling enough, for not advertising enough, or for carrying and promoting competing goods; for Praefke

had made no express or implied promise to Tecumseh concerning any of these matters. And Praefke couldn't have sued Tecumseh for not selling it enough parts at a particular price, because Praefke did not buy from Tecumseh at all, but from Industrial, and Tecumseh could not legally have fixed Industrial's resale prices and did not attempt to do so. Nor could Praefke have sued Tecumseh for terminating Industrial, or for appointing Central Power in Industrial's place, or for not compelling Central Power to continue Praefke's status as an authorized wholesaler entitled to a discount; for Tecumseh never made an express or implied promise to Praefke to retain Industrial or to assure the maintenance of Praefke's status.

The complexity of the preliminary injunction confirms the absence of a contract between Tecumseh and Praefke. Had there been a contract between the two firms that Tecumseh terminated, the preliminary injunction would have been short and sweet; it would have said, resume performance in accordance with the contract. Because there was no contract, the preliminary injunction had to create one. And so it establishes a territory of primary responsibility for Praefke, entitles Praefke to buy from Tecumseh at the price that Tecumseh suggests that its warehouse distributors sell to approved wholesalers, entitles Praefke to credit "according to the terms most recently offered to Praefke by its former [warehouse distributor, i.e., Industrial]," requires Tecumseh to "accept from Praefke its pre-season stocking order" on terms the "reasonableness of [which] shall be determined by comparison to the most ASD-friendly terms offered by CWDs Central Power and W.J. Connell Company," and on and on, paragraph after paragraph. In effect, the injunction makes Tecumseh Praefke's warehouse distributor, knocking out Central Power, which apparently, however, has no contractual right to complain.

A preliminary injunction is often said to be designed to maintain the status quo pending completion of the litigation. Chathas v. Local 134 IBEW, 233 F.3d 508, 513 (7th Cir. 2000); IDS Life Ins. Co. v. SunAmerica, Inc., 103 F.3d 524, 527 (7th Cir. 1996); Board of Education v.

Illinois State Bd. of Education, 79 F.3d 654, 657 (7th Cir. 1996); Textile Unlimited, Inc. v. A..BMH & Co., 240 F.3d 781, 786 (9th Cir. 2001); United States ex rel. Rahman v. Oncology Associates, P.C., 198 F.3d 489, 498 (4th Cir. 1999). This is not the happiest formula--in fact it's both inaccurate (as preliminary injunctions are often issued to enjoin the enforcement of a statute or contract and thus interfere with existing practices) and empty. Suppose Praefke had been a Tecumseh dealer with a real contract of its own that allowed termination without liability on 30 days' notice, and Tecumseh gave the required notice and on the twenty-ninth day Praefke asked for a preliminary injunction to prevent the termination. Would such an injunction "maintain the status quo" because an established dealership would continue, or change the status quo by suspending a term of the contract, making Praefke a dealer with at least temporary tenure rather than a dealer subject to termination at the will of his supplier?

The answer isn't important. What's important is that the preliminary injunction in this case creates a dealership where there was none, in the teeth of the parties' contract. The implications of the injunction are breathtaking: a manufacturer is locked into a contractual relationship with all his distributors' subdistributors and dealers, provided only that he had reserved in his contracts with his distributors the right to veto the distributor's choice of a particular subdistributor or dealer. There is no basis in the fair dealership law for such a result.

There also was no "community of interest" between Tecumseh and Praefke, as the statute requires. The function of this requirement is to identify situations in which the manufacturer has the dealer over a barrel. If a dealer invests heavily in the promotion of the manufacturer's brand, the manufacturer may be tempted to threaten the dealer with termination unless the dealer knuckles under to the manufacturer's demands, since termination would prevent the dealer from recouping his brand-specific investment. Ziegler Co. v. Rexnord, Inc., 407 N.W.2d 873, 879-80

(Wis. 1987); Moodie v. School Book Fairs, Inc., 889 F.2d 739, 744 (7th Cir. 1989). Whether such threats are credible or common--a manufacturer who behaved in this way would find it difficult to attract new dealers on favorable terms--and inadequately deterred by tort or contract law may be doubted. Fleet Wholesale Supply Co. v. Remington Arms Co., 846 F.2d 1095, 1097 (7th Cir. 1988). But that is not for us to say. The important point is that the Wisconsin statute targets those situations in which a relation of dependence has been created and confines statutory protection to those situations. Baldewein Co. v. Tri-Clover, Inc., 606 N.W.2d 145, 151 (Wis. 2000); Ziegler Co. v. Rexnord, Inc., supra, 407 N.W.2d at 879-80; Foerster, Inc. v. Atlas Metal Parts Co., 313 N.W.2d 60, 63 (Wis. 1981); Moodie v. School Book Fairs, Inc., supra, 889 F.2d at 744-45; Fleet Wholesale Supply Co. v. Remington Arms Co., supra, 846 F.2d at 1097. This is not one of those situations. Praefke has made no significant brand-specific investments in promoting Tecumseh's products, and its commitment to those products is too small to enable Tecumseh to bludgeon it into accepting inferior terms. It can switch, so far as appears painlessly, to other lines. Nor can we find any evidence that Tecumseh's cancellation of Industrial was intended to pressure Praefke or somehow confiscate goodwill for Tecumseh that Praefke had created by an investment that the cancellation would prevent Praefke from recouping. It is no doubt possible that Tecumseh cancelled Industrial and appointed Central Power to enable the latter (at a price, of course) to appropriate goodwill that Praefke had created, by selling directly to the retail dealers served by Praefke, but there is no evidence of so Machiavellian a scheme. The district court's unelaborated references to Tecumseh's behavior as "predatory," 110 F. Supp. 2d at 915, 917, have no basis in the record, in Praefke's ar-guments (its brief in our court assigns no reason for Tecumseh's cancellation of Industrial), or even in informed speculation.

The judgment is reversed and the preliminary injunction dissolved.

Reversed.