HOME PROTECTIVE SERVICES, INC., Plaintiff,

v.

ADT SECURITY SERVICES, INC., Defendant.

No. 03–C–0444.

United States District Court, E.D. Wisconsin.

Dec. 17, 2004.

David Lowe, Paul Jacquard, Milwaukee, WI, for Plaintiff.

Bran Butler, Joseph P. Wright (argued), Michelle M. Affatati, Madison, WI, for Defendant.

## DECISION AND ORDER

ADELMAN, District Judge.

Several plaintiffs, including Home Protective Services, Inc. ("HPS"), brought this action in state court alleging that defendant ADT Security Services, Inc. ("ADT") violated the Wisconsin Fair Dealership Law ("WFDL"), Wis. Stat. §§ 135.01—135.07. Defendant removed the case based on diversity jurisdiction. Subsequently, the plaintiffs other than HPS settled their claims. Before me now are defendant's motion for summary judgment and plaintiff HPS's motion for summary judgment on the issue of liability.[1]

---

1. Defendant also moves to strike sections of the Lowe affidavit and certain exhibits at-

## I. FACTS

Plaintiff sells, installs and services residential electronic security systems, and defendant monitors signals received from such systems and transmits them to local authorities. Plaintiff does not monitor signals, thus, when it sells or installs a security system, it must arrange to have another company monitor the system's signal. In April 1996, plaintiff became an authorized dealer of defendant's, and in February 1998, entered into an "Authorized Dealer Agreement," which remained in effect until 2002 when the parties' relationship ended. (Pl.'s Prop. Findings of Fact ("PFOF") ¶ 3.)

The agreement authorized plaintiff to hold itself out as an authorized ADT dealer and to sell and install electronic security systems.[2] Pursuant to the agreement, when it sold a system, plaintiff would typically obtain from the purchaser a signed contract authorizing defendant to monitor the system's signal. Plaintiff would then sell the contract to defendant for $1,000, $200 of which plaintiff was required to return as a "connection fee"—a fee designed to defray defendant's marketing expenses and the due diligence costs involved in approving the contract. (PFOF ¶ 13.) The agreement also contemplated that plaintiff would provide services for defendant as the parties "may, from time to time, agree." (Butler Aff. Ex. 1 § 2.1.)

In order to generate contracts to sell to defendant, plaintiff solicited customers through bulk mailings featuring defendant's logo. When a potential customer contacted plaintiff, plaintiff would schedule an appointment at the customer's home where, if the customer decided to make a purchase, the deal would be closed. When plaintiff obtained a service contract from a customer, it was required to tender the contract to defendant, which under the agreement could decline it if, for example, it considered the customer a poor credit risk. If defendant declined to purchase a contract, plaintiff could sell it to another monitoring company. If defendant purchased the contract, the contract became its property, and plaintiff's rights and obligations under the contract became defendant's. During the course of the parties' relationship, plaintiff tendered ninety-five percent of its customer contracts to defendant,[3] and defendant did not decline any of them. When a customer renewed a contract with defendant, defendant paid plaintiff "renewal income,"[4] (Pl.'s PFOF ¶ 12), and if a customer cancelled a contract before its expiration date, defendant charged plaintiff an "attrition chargeback." (Butler Aff. Ex. 1 § 15.)

Plaintiff derived over ninety-five percent of its income from its relationship with defendant. Plaintiff's average annual gross revenue was about $320,000. Between 1998 and 2001, plaintiff spent an average of $32,000 a year—ten percent of its average annual revenue—on mailings and promotional materials bearing defendant's logo. In August 2002, defendant terminated 200 of its 700 authorized dealers including plaintiff and other Wisconsin

tached thereto on the ground that they are irrelevant. However, in deciding the present motion, I have not relied on any of the information to which defendant objects and therefore will deny the motion as moot.

2. Plaintiff did not obtain the security systems it sold from defendant. However, when it sold a system that defendant would monitor, the system had to bear defendant's logo.

3. Despite the agreement's requirement that plaintiff tender all of its contracts to defendant, plaintiff did not tender a small percentage of them because it knew that the customers did not meet defendant's selection criteria. Defendant appears not to have objected to this practice.

4. In 2001, plaintiff's renewal income ranged between $200 and $1,100 per month.

dealers. At that time, plaintiff had $10,000 worth of mailers, keychains, business cards, letterhead and refrigerator magnets bearing defendant's logo, which, because of the termination, it could no longer use. Since its termination, plaintiff has worked with other monitoring companies. However, plaintiff states that these associations are less profitable than its association with defendant because the companies lack defendant's name recognition.

Additional facts will be stated in the course of the decision.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For a dispute to be genuine, the evidence must be such that

a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.* In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991). When both parties have moved for summary judgment, both are required to show that no genuine issues of fact exist, taking the facts in the light most favorable to the party opposing each motion. If issues of fact exist, neither party is entitled to summary judgment. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir.1983).

## III. DISCUSSION

The parties disagree as to whether the WFDL applies to their relationship.[5] Defendant contends that plaintiff was not a "dealer" within § 135.02(2).[6] Under the

---

**5.** If the WFDL is applicable, it is undisputed that by failing to give plaintiff ninety days notice of termination and the opportunity to cure deficiencies, defendant violated it. *See* Wis. Stat. § 135.04.

**6.** Alternatively, defendant contends that even if plaintiff was a dealer, the WFDL does not apply because plaintiff marketed its products on a door to door basis. *See* § 135.07(3) (stating that WFDL does not apply "[w]here goods or services are marketed by a dealership on a door-to-door basis"). Because I conclude that plaintiff is not a dealer, I need not address the door-to-door question. However, it is worth noting that the fact that plaintiff dealt with potential customers in their homes does not mean it marketed its product door-to-door. In *Bush v. Nat'l Sch.*

*Studios, Inc.*, 139 Wis.2d 635, 658, 407 N.W.2d 883 (1987), the state supreme court, relying on *Webster's Third New International Dictionary* (1976), defined door-to-door as house-to-house. The dictionary defined door-to-door by cross-referencing house-to-house, and it defined house-to-house as "applying successively to all residences in an area." *Id.* at 1097. Other dictionaries contain similar definitions, and *Webster's Second New College Dictionary* (1995) also makes clear that going door-to-door involves making *unsolicited* calls at every house. Thus, it appears likely that to come within the door-to-door exclusion, a party must go from one to house to another making unsolicited calls. In the present case, plaintiff did not go from one house to another making unsolicited calls.

WFDL, a dealer is "a person who is a grantee of a dealership situated in this state." Wis. Stat. § 135.02(2). A dealership is comprised of: "(1) a contract or agreement; (2) which grants the right to sell or distribute goods or services, or which grants the right to use a trade name, logo, advertising or other commercial symbol; and (3) a community of interest in the business of offering, selling or distributing goods or services." *Central Corp. v. Research Prods. Corp.*, 272 Wis.2d 561, 580, 681 N.W.2d 178 (2004). In the present case, it is undisputed that the parties entered into an agreement. However, I conclude that they did not share a community of interest. Thus, I need not address element (2).

## A. Standard for Determining Community of Interest

The WFDL defines "community of interest" as "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods and services." Wis. Stat. § 135.02(1). The Seventh Circuit has characterized this definition as "vague and unhelpful." *Frieburg Farm Equip., Inc. v. Van Dale, Inc.*, 978 F.2d 395, 398 (7th Cir.1992). The challenge in interpreting "community of interest" is to "establish some guideposts which will confine the phrase without so constricting it that it no longer extends to persons or entities the legislature intended to protect." *Ziegler Co., Inc. v. Rexnord, Inc.*, 139 Wis.2d 593, 601, 407 N.W.2d 873 (1987).

Generally, the "persons or entities the legislature intended to protect" are those who have the characteristics of a typical dealer, such as a fast-food franchise or gasoline service station. *Wilburn v. Jack Cartwright, Inc.*, 719 F.2d 262, 264–65 (7th Cir.1983); *Bush*, 139 Wis.2d at 647, 407 N.W.2d 883. The legislature did *not* intend to protect entities involved in typical

"vendor-vendee" relationships. *Central Corp.*, 272 Wis.2d at 581, 681 N.W.2d 178; *Kania v. Airborne Freight Corp.*, 99 Wis.2d 746, 768–69, 300 N.W.2d 63 (1981). However, courts have not established a bright line rule for distinguishing those the legislature intended to protect from those it did not, *Bush*, 139 Wis.2d at 647, 407 N.W.2d 883, and the Wisconsin Supreme Court has rejected "any rigid tests that would exclusively rely on percentages," *Central Corp.*, 272 Wis.2d at 581, 681 N.W.2d 178.

Rather, in determining whether parties shared a community of interest, the court has established two guideposts. The first is whether the parties shared a continuing financial interest in the operation of the dealership or the marketing of a good or service. *Id.; Bush*, 139 Wis.2d at 654–55, 407 N.W.2d 883. The second is whether the parties were interdependent, i.e., " 'the degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship.' " *Central Corp.*, 272 Wis.2d at 581, 681 N.W.2d 178 (quoting *Ziegler*, 139 Wis.2d at 605, 407 N.W.2d 873). "When construed together, these guideposts must reveal an interest in a business relationship great enough to threaten the financial health of the dealer, if the grantor were to decide to exercise its power to terminate." *Id.*

A dealer's financial health is threatened if termination would cause it to sustain a "significant economic impact." *Ziegler*, 139 Wis.2d at 605, 407 N.W.2d 873. To determine whether termination would cause a significant economic impact, a court must consult "all facets of a business relationship, as reflected in the parties' actual dealings, and [must] not limit[ ] the inquiry to one deficient factor." *Central Corp.*, 272 Wis.2d at 581, 681 N.W.2d 178. To this end, the state supreme court has

compiled a non-exhaustive list of such "facets:"

> [H]ow long the parties have dealt with each other; the extent and nature of the obligations imposed on the parties in the contract or agreement between them; what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services; the extent and nature of the alleged grantor's grant of territory to the alleged dealer; the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; the personnel which the alleged dealer devotes to the alleged dealership; how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services.

*Id.* at 582, 681 N.W.2d 178 (quoting *Ziegler*, 139 Wis.2d at 606, 407 N.W.2d 873) (alteration in original). In essence, the court has adopted a "totality of the circumstances" test for determining whether a community of interest exists. *See Sales & Mktg. Assocs., Inc. v. Huffy Corp.*, 57 F.3d 602, 606 (7th Cir.1995); *Frieburg Farm Equip.*, 978 F.2d at 399; *Best Group, Inc. v. Dri–Steem Humidifier Co., Inc.*, 254 F.Supp.2d 1073, 1078 (E.D.Wis.2003).

In applying the state supreme court's test,[7] the Seventh Circuit has stated that the function of the community of interest requirement is to identify situations in which the alleged grantor has the alleged dealer "over a barrel." *See, e.g., Praefke Auto. Elec. & Battery Co., Inc. v. Tecumseh Prods. Co., Inc.*, 255 F.3d 460, 464 (7th Cir.2001); *Moodie v. Sch. Book Fairs, Inc.*, 889 F.2d 739, 744 (7th Cir.1989). An alleged grantor has an alleged dealer over a barrel when the dealer has invested "heavily" in the grantor's brand because, when a dealer has made such brand-specific investments, an unscrupulous grantor can behave opportunistically and "exploit the fear of termination that naturally attends a dealer's investment in grantor-specific assets." *Praefke*, 255 F.3d at 464–65; *Frieburg Farm Equip.*, 978 F.2d at 399. Thus, the Seventh Circuit appears to have defined "the persons or entities the [Wisconsin] legislature intended to protect," *Ziegler*, 139 Wis.2d at 601, 407 N.W.2d 873, as those who are subject to exploitation at the hands of a supplier.

Although for a community of interest to exist, the alleged grantor must have the alleged dealer over a barrel, that fact alone may not be sufficient to establish a community of interest.[8] *See Aida Eng'g, Inc. v. Red Stag, Inc.*, 629 F.Supp. 1121, 1126 (E.D.Wis.1986) (stating that WFDL was not designed to protect every business relationship essential to the financial survival

---

7. In a diversity case, a federal court must apply state substantive law. *See, e.g., Allstate Ins. Co. v. Keca,* 368 F.3d 793, 796 (7th Cir. 2004).

8. Otherwise, some typical vendor-vendee relationships could fall under the WFDL. For instance, a vendee might purchase a product from a vendor that accounts for only a small percentage of its sales, but if its largest customer insisted on purchasing the product from the vendee along with its other purchases, the vendor's threat to terminate the vendee would put it over a barrel. The WFDL does not protect this type of relationship. *See, e.g., Central Corp.,* 272 Wis.2d at 581, 681 N.W.2d 178 (stating that community of interest requirement is intended to "weed out the typical vendor-vendee relationship").

of one or more of the parties involved). Where one party has the other over a barrel, a court must nevertheless review the other facets of the parties' relationship to determine whether the alleged dealer is a person or entity that the legislature intended to protect. *See, e.g., Frieburg Farm Equip.*, 978 F.2d at 399–400 (stating that alleged grantor had alleged dealer over a barrel but, nevertheless, examining other facets of relationship before concluding that community of interest existed); *Moodie*, 889 F.2d at 744–45 (same). In short, under the Seventh Circuit's application of the Wisconsin Supreme Court's community of interest cases, a court must determine whether the alleged grantor has the alleged dealer over a barrel, and if it answers this question affirmatively, it must then determine whether other aspects of the parties' relationship indicate that the alleged dealer is a person or entity the Wisconsin legislature intended to protect.

## B. Application to Facts

■ In the present case, the parties agree on the relevant facts but disagree as to whether, based on such facts, they shared a community of interest.[9] As discussed, I first address whether defendant had plaintiff over a barrel. Plaintiff argues that defendant had it over a barrel because: (1) plaintiff derived over ninety-five percent of its revenue from its relationship with defendant; (2) plaintiff invested $32,000 annually in advertising bearing defendant's logo; (3) upon termination, plaintiff was left with $10,000 in advertising materials bearing defendant's logo or name that were useless; (4) as the result of being terminated, plaintiff lost between $200 and $1,100 per month in renewal income; and (5) as the result of being terminated, plaintiff could no longer enter into subcontracts with defendant to perform maintenance work and provide other services.[10] However, as explained below, I conclude that defendant did not have plaintiff over a barrel.

The fact that plaintiff's relationship with defendant accounted for over ninety-five percent of its revenue is an indication that defendant had plaintiff over a barrel but is not dispositive of the issue. *See Sales & Mktg. Assocs.*, 57 F.3d at 606; *Frieburg*

9. Courts have stated that when the material facts are undisputed, the community of interest question is one of law for the court. *See Frieburg Farm Equip.*, 978 F.2d at 398; *Super Natural Distribs., Inc. v. Muscletech Research & Dev.*, 196 F.Supp.2d 761, 770 (E.D.Wis. 2002); *Bush*, 139 Wis.2d at 645–46, 407 N.W.2d 883; *Kania*, 99 Wis.2d at 762–63, 300 N.W.2d 63. However, in *Central Corp.*, the Wisconsin Supreme Court stated that "[w]here there are genuine issues of material fact or reasonable alternative inferences drawn from undisputed material facts, the determination of whether there is a community of interest is one which will be made by the trier of fact based on an examination of all of the facets of the business relationship." 272 Wis.2d at 565–66, 681 N.W.2d 178. One could conceivably read this statement to mean that the existence of a community of interest is itself a question of fact. However, because the *Central Corp.* court did not mention any of the cases indicating that the community of interest question is one of law, it is more reasonable to read the above statement to mean that when the facts are undisputed, community of interest is a question of law for the court and that only when the underlying facts are disputed is community of interest a question to be decided by the jury. In the present case, the parties agree that the community of interest issue is one of law.

10. Although plaintiff points to other aspects of its relationship with defendant, which it claims support a finding of a community of interest under *Ziegler*, I conclude that only those mentioned above are relevant to whether defendant had plaintiff over a barrel. *See Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 914 F.Supp. 296, 300 (E.D.Wis.1996) (stating that a court need not examine every *Ziegler* factor in making community of interest determination).

*Farm Equip.*, 978 F.2d at 398–99; *Cabinetree*, 914 F.Supp. at 300–01; *Central Corp.*, 272 Wis.2d at 581, 681 N.W.2d 178; *Baldewein Co. v. Tri–Clover, Inc.*, 233 Wis.2d 57, 72, 606 N.W.2d 145 (2000); *Ziegler Co.*, 139 Wis.2d at 603, 407 N.W.2d 873; *Guderjohn v. Loewen–America, Inc.*, 179 Wis.2d 201, 209–10, 507 N.W.2d 115 (Ct. App.1993). In fact, courts have declined to find a community of interest even where an alleged grantor's products or services accounted for a significant percentage of an alleged dealer's revenue. *See Sales & Mktg. Assocs.*, 57 F.3d at 606; *Best Group*, 254 F.Supp.2d at 1078–79; *Cabinetree*, 914 F.Supp. at 300–01; *Guderjohn*, 179 Wis.2d at 209–10, 507 N.W.2d 115. An alleged dealer's earning a substantial percentage of its revenue from an alleged grantor is indicative of a community of interest if the loss of such revenue might cause the alleged dealer to go out of business. This is so because in such a situation the alleged grantor could use the threat of termination to extract concessions from the alleged dealer. An alleged dealer's earning a substantial percentage of its revenue from an alleged grantor is *not* indicative of a community of interest where the alleged dealer could easily find a replacement for the alleged grantor's goods or services. In that situation, the presence of competitors will arguably prevent the alleged grantor from behaving opportunistically. *Cf. Fleet Wholesale Supply Co., Inc. v. Remington*

*Arms Co., Inc.*, 846 F.2d 1095, 1097 (7th Cir.1988) (stating that where competition hinders alleged grantor's ability to extract concessions from alleged dealer, no community of interest exists).

In the present case, plaintiff was less dependent on defendant than the ninety-five percent figure suggests. This is so because it was possible for plaintiff to find a substitute for defendant at little cost. If, in order to extract concessions, defendant had threatened to terminate plaintiff, plaintiff could have continued in business and sold its customer contracts to a competitor of defendant. And because plaintiff's brand-specific investments were small,[11] plaintiff could have switched to a different monitoring company with relatively little cost.[12] Thus, although defendant accounted for ninety-five percent of plaintiff's revenue, the existence of competitors inhibited defendant from using the relationship opportunistically.[13]

Further, none of the other pertinent aspects of the parties' relationship indicates that defendant had plaintiff over a barrel. Although plaintiff spent approximately $32,000 a year—about ten percent of its average annual revenue—in advertising featuring defendant's logo, these expenditures did not constitute the type of investment necessary to create a community of interest. Plaintiff's advertising costs were for printing and mailing flyers bearing de-

**11.** As explained below, plaintiff's ADT-specific investments amounted to about three to seven percent of its average annual revenue.

**12.** Plaintiff has not argued that it encountered any difficulty in finding another monitoring company to do business with.

**13.** Although plaintiff claims that defendant's competitors are less well-known than defendant and that as a result plaintiff's profits will diminish, this would not establish that defendant had plaintiff over a barrel. The threat of lost profits alone does not establish a commu-

nity of interest. *Sales & Mktg. Assocs.*, 57 F.3d at 607 (citing *Guderjohn*, 179 Wis.2d 201, 507 N.W.2d 115); *see also Best Group*, 254 F.Supp.2d at 1080. Rather, the threat of lost profits creates a community of interest only when the loss of such profits will result in the alleged dealer's being unable to obtain a return on its investment in grantor-specific assets. *See Sales & Mktg.*, 57 F.3d at 607. Thus, the fact that plaintiff will earn fewer profits by working with another monitoring company does not mean that defendant had it over a barrel.

fendant's logo. It is highly likely that over the course of its six year relationship with defendant, plaintiff recouped these costs in income generated by customers who responded to the ads. To the extent that plaintiff did not recoup its advertising costs, its investment was *de minimis* and not the kind of "heavy 'front end' " investment in advertising that might give rise to a community of interest. *See Moore v. Tandy Corp.*, 819 F.2d 820, 823 (7th Cir. 1987) (quoting *Aida Eng'g*, 629 F.Supp. at 1126, which states that "heavy 'front-end' dealer investment in advertising might qualify for WFDL protection because the dealer might otherwise be unjustly deprived of a return on that investment if the venture is successful"). Moreover, the $10,000 worth of unusable advertising materials that plaintiff was left with as the result of being terminated was, in the context of the total amount of revenue generated by the parties' combined efforts, too small to give rise to a community of interest.

The amount of renewal income that plaintiff lost as a result of the termination was also too small to put plaintiff over a barrel. Plaintiff estimates that, absent termination, it would have earned between $200 and $1,100 per month in renewal income—between $2,400 to $13,200 per year. Although this income could be reasonably characterized as a return on plaintiff's prior promotional efforts, the amount of such income was insufficient to create a community of interest.

Finally, the supplementary services such as maintenance that plaintiff provided to defendant were not unrecoverable investments because defendant paid plaintiff for such work on a fee basis.

In sum, defendant did not have plaintiff over a barrel, and the parties, therefore, did not share a community of interest. Although plaintiff derived a substantial proportion of its revenue from its relationship with defendant and made some brand-specific investments, considering the totality of the circumstances, plaintiff remained a relatively free agent. Plaintiff's unrecoverable investments in defendant's brand consisted of between $10,000 and $23,200 or about three to seven percent of plaintiff's average annual income.[14] This investment was not the type of "heav[y]" investment that would create a continuing financial interest, interdependence or a relationship in which defendant had plaintiff over a barrel. *Praefke*, 255 F.3d at 464–65. *Compare Moodie*, 889 F.2d at 740–41 (finding that grantor had dealer over a barrel where dealer invested between approximately $20,000 and $46,000 in grantor-specific assets), *and Frieburg Farm Equip.*, 978 F.2d at 399 (finding that grantor had dealer over a barrel where dealer invested approximately $70,000 in grantor-specific assets), *with Cabinetree*, 914 F.Supp. at 301–302 (finding that no community of interest existed where alleged dealer invested about $26,600, or about two percent of alleged dealer's gross yearly sales, in grantor-specific assets). Therefore, the WFDL does not apply to the present case.

### IV. CONCLUSION

For the reasons stated,

**IT IS ORDERED** that defendant's motion for summary judgment is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff's motion for partial summary judgment is **DENIED**.

14. As previously stated, plaintiff's average annual revenue was $320,000. Its unrecoverable defendant-specific investments included $10,000 in unusable advertising materials and, arguably, approximately $200 to $1,100 per month in lost renewal income.

IT IS FURTHER ORDERED that defendant's motion to strike is **DENIED** as **MOOT**.

**FINALLY, IT IS ORDERED** that the Clerk of Court enter judgment accordingly.