William Moe d/b/a Moe Hardware,
Plaintiff-Respondent,

v.

Benelli U.S.A. Corp., Defendant-Appellant.

Court of Appeals

*No. 2006AP1512. Submitted on briefs November 7, 2006.
—Decided November 29, 2007.*

2007 WI App 254

(Also reported in 743 N.W.2d 691.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Christine A. Gimber* and *Ryan J. Steffes* of *Weld, Riley, Prenn & Ricci, S.C.*, Eau Claire.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Paul B. Millis* and *Susan K. Deschler* of *Skolos & Millis*, Black River Falls.

Before Higginbotham, P.J., Dykman and Vergeront, JJ.

¶ 1. HIGGINBOTHAM, P.J. Benelli USA Corp., a gun manufacturer, appeals a circuit court order granting

summary judgment in favor of William Moe, d/b/a Moe's Hardware, and denying Benelli's motion for summary judgment in Moe's action against Benelli. Moe's suit alleged that Benelli violated the Wisconsin Fair Dealership Law (WFDL), Wis. Stat. § 135.04 (2005–06)[1], by terminating gun sales to Moe without showing good cause or providing adequate notice for the action. Benelli argues that it is entitled to summary judgment on federal preemption grounds because, under the circumstances, the conduct necessary to bring Benelli into compliance with the WFDL would put it in violation of the Sherman Anti-Trust Act (Sherman Act). Benelli argues in the alternative that it is entitled to summary judgment because no community of interest necessary to create a dealership under the WFDL existed between it and Moe.

¶ 2. We conclude on the undisputed facts that a community of interest did not exist between Benelli and Moe and, therefore, Moe's complaint fails to state a claim against Benelli under the WFDL. Because Benelli prevails on these grounds, we do not address whether, under the circumstances presented, the Sherman Act preempts the WFDL. Accordingly, we reverse the circuit court's order granting summary judgment in favor of Moe, and remand for the circuit court to enter an order granting Benelli's motion for summary judgment.

## Background

¶ 3. The relevant facts, taken from the parties' summary judgment submissions, are undisputed. William Moe owns and operates Moe's Hardware in Black River Falls, which sells firearms. In February 1998, Moe

---

[1] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

began selling Benelli shotguns after executing an agreement with Benelli designating Moe as a Benelli authorized dealer. The agreement set forth the responsibilities of Moe and Benelli in detail. From 1998 to 2003, Moe purchased $384,749.25 in Benelli products. Moe testified that approximately 2% of the total guns sold by his store in 1998 were Benelli products; by 2003, this figure had risen to 4–5%.

¶ 4. Brad Swiontek, the Benelli sales representative for the state of Wisconsin, testified in deposition that he received several complaints from other dealers that Moe was selling Benelli guns at prices that were substantially lower than those of other retailers. Stephen Otway, General Manager of Benelli USA, averred in an affidavit that he decided not to renew Moe's dealership at the end of 2003 because of these complaints. By a letter dated November 14, 2003, Benelli notified Moe of its decision "not to renew" Moe's "Authorized Dealership for the 2004 Sales Program year" without stating reasons for the nonrenewal.[2] Additional facts will be set forth as necessary in the discussion section.

¶ 5. Moe sued Benelli, alleging that its nonrenewal of the dealership violated the provisions of the WFDL requiring ninety-day notice of termination and good cause to terminate the dealership. Benelli moved for summary judgment, and Moe requested summary

---

[2] The "Dealership Agreement" between Moe and Benelli stated that its term "shall be until December 1st of each year, and may be extended in writing at the sole discretion of the Company." The record does not show whether, in fact, a written instrument was used to extend the agreement each year until the termination in late 2003. Regardless, it is undisputed that the relationship between Moe and Benelli established by the February 1998 agreement was on-going when Benelli terminated sales to Moe in 2003, and that the written agreement continued to be relevant to that relationship.

judgment under WIS. STAT. § 802.08(6).[3] The circuit court awarded summary judgment to Moe, rejecting Benelli's defenses that the WFDL was preempted under the circumstances by the Sherman Act, and that its relationship with Moe was not a dealership subject to the requirements of WIS. STAT. § 135.04[4] because a community of interest did not exist between the parties.

¶ 6. With respect to the latter defense, the circuit court concluded that the parties shared a community of interest based on the amount Moe paid in Benelli products from 1998 to 2003 relative to the size of the local economy. The court reasoned: "[T]he issue of percentage of sales does not diminish the community interest . . . . [F]or a city like Black River Falls and a hardware store, $380,000, even though it's only 3 percent, is a significant amount of money." Benelli appeals.

---

[3] WISCONSIN STAT. § 802.08(6) provides that the court may award summary judgment to the party against whom a motion for summary judgment is asserted even if the party has not moved for summary judgment.

[4] WISCONSIN STAT. § 135.04 provides in full:

**Notice of termination or change in dealership.** Except as provided in this section, a grantor shall provide a dealer at least 90 days' prior written notice of termination, cancellation, nonrenewal or substantial change in competitive circumstances. The notice shall state all the reasons for termination, cancellation, nonrenewal or substantial change in competitive circumstances and shall provide that the dealer has 60 days in which to rectify any claimed deficiency. If the deficiency is rectified within 60 days the notice shall be void. The notice provisions of this section shall not apply if the reason for termination, cancellation or nonrenewal is insolvency, the occurrence of an assignment for the benefit of creditors or bankruptcy. If the reason for termination, cancellation, nonrenewal or substantial change in competitive circumstances is nonpayment of sums due under the dealership, the dealer shall be entitled to written notice of such default, and shall have 10 days in which to remedy such default from the date of delivery or posting of such notice.

## Standard of Review

¶ 7. This appeal requests review of the circuit court's order granting summary judgment to Moe. We review an award of summary judgment de novo, applying the same methodology as the circuit court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). Summary judgment is required if the pleadings and evidentiary submissions of the parties "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2). A court may enter judgment in favor of a party opposing a motion for summary judgment when it appears that the opposing party is entitled to summary judgment. WIS. STAT. § 802.08(6); *see, e.g. Community Dev. Auth. v. Racine Co. Condemnation Comm'n*, 2006 WI App 51, ¶ 11, 289 Wis. 2d 613, 712 N.W.2d 380.

¶ 8. As we explain later, the issue on which the summary judgment motion turns is whether a community of interest necessary to create a dealership within the meaning of WIS. STAT. § 135.04 existed between Benelli and Moe. When the underlying facts are undisputed, whether a community of interest exists is a question of law that we decide independent of the circuit court.[5] *See, e.g. Bush v. National School Studios, Inc.*, 139 Wis. 2d 635, 645–46, 407 N.W.2d 883 (1987);

---

[5] As a federal district court noted in *Home Protective Services, Inc. v. ADT Security Services, Inc.*, 348 F. Supp. 2d 1010, 1015 n.9 (E.D. Wis. 2004), state and federal courts applying the Wisconsin Fair Dealership Law have long held that, when the facts are undisputed, whether a community of interest exists between the grantor and the dealer is an issue of

law for the court. *See, e.g. Bush v. National Sch. Studios, Inc.*, 139 Wis. 2d 635, 645–46, 407 N.W.2d 883 (1987); *Kania v. Airborne Freight Corp.*, 99 Wis. 2d 746, 762–63, 300 N.W.2d 63 (1981); *Frieburg Farm Equip., Inc. v. Van Dale, Inc.*, 978 F.2d 395, 398 (7th Cir. 1992). The parties agree that, on the undisputed facts of this case, the question of whether their relationship formed a community of interest is a question of law. However, in *Central Corp. v. Research Products Corp.*, 2004 WI 76, ¶ 2, 272 Wis. 2d 561, 681 N.W.2d 178, the supreme court stated as follows: "Where there are genuine issues of material fact or reasonable alternative inferences drawn from undisputed material facts, the determination of whether there is a community of interest is one which will be made by the trier of fact based on an examination of all of the facets of the business relationship."

Addressing this statement, the federal district court in *Home Protective Services* observed that "[o]ne could conceivably read *Central Corp.* to mean that the existence of a community of interest is itself a question of fact." *Home Protective Servs.*, 348 F. Supp. 2d at 1015 n.9. However, the *Home Protective Services* court concluded that *Central Corp.* was more reasonably read to state that when the factual basis for the community of interest determination is disputed, including when the dispute is based on the existence of reasonable alternative inferences drawn from undisputed facts, and such disputes are material to whether there is a community of interest, a triable issue of fact exists and summary judgment is inappropriate. Applying this reading of *Central Corp.*, the *Home Protective Services* court analyzed the community of interest question as one of law where the facts of the case were undisputed and no reasonable alternative inferences could be drawn from the undisputed facts. We find the federal district court's reading of *Central Corp.* to be persuasive. Significantly, the *Central Corp.* court did not declare that it was overruling *Kania, Bush* and other cases that had treated the community of interest question as one of

## Discussion

¶ 9. Chapter 135 of the Wisconsin statutes, the Wisconsin Fair Dealership Law, is a remedial statute that seeks to shield dealers from unfair business practices by grantors. *See* WIS. STAT. § 135.025(2). WISCONSIN STAT. § 135.04 of the WFDL imposes several requirements upon grantors attempting to terminate or substantially change the terms of a dealership. A grantor must give written notice of a termination or change in the dealership at least ninety days prior to the action, state the reasons for its decision, and provide the dealer sixty days in which to remedy any claimed deficiency. Section 135.04.

---

law. We believe that, had the supreme court intended to overrule these cases, it would have done so expressly. *See, e.g. State v. Vogelsberg*, 2006 WI App 228, ¶ 14, 297 Wis. 2d 519, 724 N.W.2d 649; *Vollmer v. Luety*, 150 Wis. 2d 891, 902, 443 N.W.2d 32 (Ct. App. 1989) (the absence of an express statement suggests that the supreme court did not intend to overrule established precedent). *Id.* We therefore conclude that when no factual disputes exist, including those arising from the existence of reasonable alternative inferences drawn from otherwise undisputed facts, the community interest question is one of law for the court.

The disposition of *Ziegler Co. v. Rexnord, Inc.*, 139 Wis. 2d 593, 611–13, 407 N.W.2d 873 (1987), the seminal case regarding the issue of community of interest, is illustrative here. In *Ziegler*, the supreme court remanded for a trial because it could not determine on the summary judgment submissions whether a community of interest existed. *Id.* However, it ordered the remand because the undisputed facts gave rise to reasonable alternative inferences, the resolution of which were potentially material to the community interest issue, not because the application of those facts to the multi-factored community interest test was itself a matter of fact that could not be decided by the court on summary judgment. *Id.*

¶ 10. Benelli does not dispute that its nonrenewal of the agreement with Moe violated the ninety-day notice and opportunity to remedy provisions of the WFDL. Rather, Benelli asserts two complete defenses to Moe's claim. First, it contends that, under the circumstances, it could not comply with provisions of the WFDL without also violating the Sherman Act. Benelli argues that, had it informed Moe of the reason for the nonrenewal (Moe's pricing and complaints about the pricing Benelli received from other dealers) and given Moe a chance to remedy the problem, satisfying the notification of good cause and opportunity to cure requirements of WIS. STAT. § 135.04, it would have violated the vertical pricing constraints of the Sherman Act. Second, Benelli argues in the alternative that it is not subject to the requirements of § 135.04 because its relationship with Moe was not a dealership within the meaning of the statute because the relationship was not based on a community of interest. Our analysis focuses on the community of interest question.

■

¶ 11. A business relationship is a dealership within the meaning of the WFDL if it satisfies the following elements: "(1) a contract or agreement; (2) which grants the right to sell or distribute goods or services, or which grants the right to use a trade name, logo, advertising or other commercial symbol; and (3) a community of interest in the business of offering, selling or distributing goods or services." *Central Corp. v. Research Prods. Corp.*, 2004 WI 76, ¶ 29, 272 Wis. 2d 561, 681 N.W.2d 178 (citations omitted).[6]

---

[6] These elements are based on the definition of dealership provided in WIS. STAT. § 135.02(3)(a), which states as follows:

> A contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a

¶ 12. The third element of the dealership test, community of interest, is "probably the element which most distinguishes dealerships from other forms of business arrangements." *Ziegler Co. v. Rexnord, Inc.*, 139 Wis. 2d 593, 600, 407 N.W.2d 873 (1987). Community of interest is defined by the WFDL as "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services." Wis. Stat. § 135.02(1).

¶ 13. In *Ziegler*, the supreme court established two "guideposts" to assist courts in determining whether a community of interest exists in a given case. *Ziegler*, 139 Wis. 2d at 601, 604–05. The first of these, continuing financial interest, is taken directly from the statutory definition of "community of interest" in Wis. Stat. § 135.02(1). *Id.* at 604. The second, interdependence, was read into the definition of "dealership," § 135.02(3), by the *Ziegler* court, and defined as "the degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship." *Id.* at 605.

¶ 14. When considered in light of the statute's purpose to protect dealers from unfair practices of powerful grantors, the *Ziegler* court explained that "continuing financial interest" and "interdependence" "require a person to demonstrate a stake in the relationship large enough to make the grantor's power to terminate, cancel or not renew a threat to the economic health of the person (thus giving the grantor inherently superior

person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

bargaining power)." *Id.* at 605. The putative dealer's economic health is threatened where the putative grantor's adverse action "would have a significant economic impact" on the dealer. *Id.*

¶ 15. The requirement that the putative grantor's action pose a threat to the economic health of the dealer is "intended to weed out the typical vendor-vendee relationship." *Central Corp.*, 272 Wis. 2d 561, ¶ 32. Similarly, federal cases applying the WFDL state that the function of the community of interest requirement is to limit the WFDL's application to situations in which the putative grantor has the putative dealer "over a barrel." *See Home Protective Servs., Inc.*, 348 F. Supp. 2d at 1014 (*citing Praefke Auto. Elec. & Battery Co. v. Tecumseh Prods. Co.*, 255 F.3d 460, 464 (7th Cir. 2001); *Moodie v. School Book Fairs, Inc.*, 889 F.2d 739, 744 (7th Cir. 1989)).

¶ 16. Courts considering whether a particular business relationship is marked by a community of interest examine the relationship in its totality, as evidenced by the conduct of the parties and the terms of their contract or agreement. *Ziegler*, 139 Wis. 2d at 605–06. Numerous facets of the relationship may be relevant to such a determination, including but not limited to:

> how long the parties have dealt with each other; the extent and nature of the obligations imposed on the parties in the contract or agreement between them; what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; what percentage of the gross proceeds or profits [] the alleged dealer derives from the alleged grantor's products or services; the extent and nature of the alleged

824

granter's grant of territory to the alleged dealer; the extent and nature of the alleged dealer's uses of the alleged granter's proprietary marks (such as trademarks or logos); the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; the personnel which the alleged dealer devotes to the alleged dealership; how much the alleged dealer spends on advertising or promotional expenditures for the alleged granter's products or services; the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged granter's products or services.

*Id.* at 606. The *Ziegler* court explained that each of these facets may relate to one or both of the guideposts. *Id.*

¶ 17. Turning to the undisputed facts of the present case, we consider the various facets of the parties' business relationship in view of the continuing financial interest and interdependence guideposts. Moe points to numerous terms of the parties' written agreement that relate to the parties' level of interdependence. Foremost, Moe emphasizes agreement terms that impose obligations on Moe for Benelli's benefit, including that Moe "maintain a minimum inventory" of Benelli product "commensurate with the size" of Moe's operation; "adequately, prominently and permanently display" Benelli products, name and marks; instruct sales staff about Benelli products and ensure that they can demonstrate products to customers; sell Benelli products "only to end users"; maintain all applicable federal, state and local licenses; and "further the interest" of Benelli. Moe also references evidence of the parties' actual dealings that pertain to their degree of interdependence, including that Moe was the only

825

Benelli retailer in Black River Falls, and the nearly six-year duration of the parties' relationship.

¶ 18. Moe emphasizes other details of the parties' relationship that relate to the continuing financial interest guidepost. Specifically, Moe notes that the agreement requires Moe to advertise Benelli products, name and marks in local and regional media. Moe testified in deposition that in 2003 his store spent $1500 to advertise Benelli products. Moe averred in interrogatory answers that his store's investment in Benelli inventory increased from $23,489.50 in 1998 to $109,222.90 in 2003. Moe also averred that, from 1998 to 2003, his store purchased $384,749.25 in Benelli products. Moe emphasizes that his store specializes in sporting goods, which includes firearms; Moe testified that 40% of store sales are in sporting goods.

¶ 19. For its part, Benelli focuses on evidence that it contends demonstrates that the nonrenewal of the agreement did not threaten the economic health of Moe's business. It notes that Benelli products never accounted for more than 8–10% of Moe's gross gun sales in any given year.[7] It cites testimony from Moe that, in 2003, Moe's best year for Benelli products, only 4–5% of the guns sold by his store were made by Benelli. It observes that Moe's answers to interrogatories show that in 1998, the cost of all goods sold at Moe's was over $1.7 million, while the cost of Benelli products was only $23,489.50, or 1.3% of the total cost of goods sold. By 2003, the cost of Benelli products had increased to

---

[7] Moe's brief states that "7% of [the store's] 2003 sales were from Benelli accessories," citing to Moe's deposition. We do not find this statement in the record. On the page cited, Moe's deposition states that "I would say eight to 10 percent" of total gun sales in 2003 were from Benelli products.

$109,222.90, but this amount still represented only 4.7% of the total cost of goods sold for that year (approximately $2.3 million). Finally, Benelli notes that in 2004, the year after Moe's relationship with Benelli ended, Moe's gross sales actually increased to $2.85 million from $2.66 million in 2003.

¶ 20. Benelli cites Moe's interrogatory answers stating that, of the store's 9500 square foot display area, only 400 square feet was devoted to the display of firearms, and only 10 square feet was devoted to the display of Benelli products. Benelli notes that Moe also averred that only 400 square feet of the 9500 square foot basement storage area was used to store firearms, and only 20 square feet was needed to store Benelli products.

¶ 21. Weighing the various facets of the parties' relationship that bear upon the community of interest question, we conclude that Moe and Benelli did not share a community of interest, placing their business relationship outside of the protections of the WFDL. The undisputed facts demonstrate that the parties' relationship was more akin to a vendor-vendee relationship than a dealership. By Moe's account, Moe's Hardware is a full-line hardware store with ten retail departments. While Moe's sporting goods department accounted for 40% of Moe's sales, firearms represented an unknown portion of the sales in that department. And, of this segment of Moe's sales, Benelli products accounted for only 8–10% of the gross revenues from firearms and 4–5% of the firearms sold. In 2003, only 4.7% of the store revenue in goods sold was from Benelli products. *See Ziegler*, 139 Wis. 2d at 603 (percentage of business revenues is an important indicator of whether

there is a community of interest). Benelli was neither Moe's best-selling brand of firearm by units nor in total dollars.

¶ 22. As noted, only 400 of Moe's 9500 square feet of display space was devoted to firearms, and, of that, Moe devoted only 10 square feet to Benelli products. Only 20 of the 9500 square feet of storage space in Moe's basement was taken up by Benelli products.

¶ 23. We recognize that the agreement places several obligations upon Moe that indicate a certain degree of interdependence. However, the agreement's minimum inventory provision required only that Moe keep three Benelli firearms on hand, hardly an onerous requirement for an operation with gross sales of $2.66 million in 2003. It also appears from testimony of Benelli sales representative Brad Swiontek that Moe did not consistently observe the requirement that the store "adequately, prominently and permanently display" Benelli products; Swiontek twice noted in 2003 that Moe did not have any Benelli products on display. Regardless, the degree of interdependence indicated by the agreement terms is not sufficient to show that Benelli's nonrenewal posed a threat to the economic health of Moe's business. In fact, Moe averred that the store's gross sales *increased* by 6.5% the year after he stopped carrying Benelli products.

¶ 24. Moe urges us to adopt, in part, the reasoning of the circuit court, which concluded that the community of interest requirement was satisfied based on the total cost of Benelli products from 1998 to 2003, $384,749.25, viewed in light of the modest size of Black River Falls' local economy. Assuming without deciding that the size of a local economy relative to the cost of a putative dealers' inventory of the grantor's products is a relevant factor in determining the existence of a

community of interest, we conclude that this factor does not demonstrate the existence of a community of interest in this case. Other factors, such as the percentage of unit sales and gross revenues in Benelli products, the amount of display space devoted to Benelli firearms, and the continued economic health of Moe's business following the nonrenewal, are more pertinent in this case and serve to demonstrate that a community of interest did not exist between the parties.

¶ 25. In sum, based on the undisputed facts contained in the summary judgment submissions, we conclude that the parties' relationship did not evidence a community of interest to establish a dealership within the meaning of the WFDL. Therefore, Benelli's nonrenewal of the agreement with Moe was not subject to the requirements of the WFDL. Accordingly, we reverse the circuit court's order granting Moe summary judgment, and remand to the circuit court to enter an order granting Benelli's motion for summary judgment. Because our conclusion with respect to the community of interest issue is dispositive, we do not address Benelli's argument that the WFDL was inapplicable under the circumstances for reasons of federal preemption.

*By the Court.*—Order reversed and cause remanded with directions.